WESTMORELAND HEIGHTS, et al. v. J. B. MARTIN

and

WESTMORELAND HEIGHTS et al. v. VOLNEY B. MARTIN,
by Next Friend.

Eastern Section. February 14, 1930.

Petition for Certiorari denied by Supreme Court, July 5, 1930.

D. C. Webb, Frank Montgomery, and John Jennings, Jr., all of Knoxville, for plaintiff in error.

Johnson & Cox, of Knoxville, for defendant in error.

THOMPSON, J. On Sunday night, September 18, 1927, Volney B. Martin (then 20 years old) while driving with a young lady in his automobile in Westmoreland Heights near Knoxville, ran into a steel wire cable which had been stretched across the road and re-

ceived severe personal injuries. By next friend, etc., he sued Westmoreland Heights, a corporation, and O. M. Davis, a contractor, to recover damages for personal injuries, damages to his automobile and expenses incurred by him in treating his injuries. His father, J. B. Martin, also sued Westmoreland Heights and O. M. Davis to recover for medical and hospital, etc., expenses which he had incurred. The cases were tried together in the circuit court and resulted in verdicts and judgments in favor of Volney B. Martin, against both defendants for $4,800, and in favor of J. B. Martin against both defendants for $1200. Their motions for new trials having been overruled, both defendants have appealed to this Court and have assigned errors.

Westmoreland Heights, a corporation, owns a large area of land, known as Westmoreland Heights, lying four or five miles west of Knoxville and outside of the City limits. About three years before the happening of the accident it constructed roads through this land and divided it into building lots. At present it appears to be one of the best and most promising subdivisions near Knoxville. A large blue print of the subdivision was sent up with the record and reference is made to it.

The roads in the subdivision were constructed of macadam and at the time of the accident there were ten or more residences in it—all occupied. After the construction of the roads and the opening of the subdivision the said corporation through its agents, put up signs and ran newspaper advertisements, etc., inviting the public to drive through the subdivision, day or night, and the public immediately began driving through and along the roads in said subdivision. This use of the roads by the public (as well as by the residents of the subdivision) was extensive, and by the late summer of the year 1927, the roads had become worn, washed and dusty, and the company decided to scarify, reshape, roll and oil or tar them.

Mr. O. M. Davis, a reputable and reliable road construction contractor, had built the roads and on August 20, 1927, he made a contract with the company evidenced by the following writing.

"Knoxville, Tennessee,
August 20, 1927.

"Mr. Cecil H. Baker, President,
Westmoreland Heights,
Knoxville, Tennessee.
Dear Sir:

"We beg to quote you herewith a price of twenty cents (20c) per square yard for reconstructing and putting tar on Sherwood Drive in Westmoreland Heights, and twelve and a half cents (12-1/2c) per square yard for the same work on Stone Mill Road.

"In reconstructing said roads, we will repair them, furnish all necessary stone of proper size, including screenings and chats, which shall be clean and free of all dust. We will also do all necessary scarifying and reshaping so as to have a four inch crown on all streets and ways and properly banked on all curves so as to leave the surface entire length of both roads so that the water will not stand thereon even after substantial use.

"We will apply two applications of tar and do all necessary rolling so as to complete the roads and leave them in good workmanlike condition.

"We also agree to pay demurrage on any tar cars after we have had six working days to remove the tar from the cars. You are to bear the expense of demurrage for rainy days or days which the road cannot be worked. We agree to work diligently on every day that the road is sufficiently dry to be worked.

"This August 20, 1927.

"O. M. Davis,
Westmoreland Heights,
By Cecil H. Baker, Pt."

It will be observed that the above contract does not specifically state that Westmoreland Heights was to furnish the oil or tar, but there was an oral agreement that it would furnish said oil or tar in railroad tank cars on a railroad siding about two miles from the property. And it did thus furnish said oil or tar.

Pursuant to said contract Davis began scarifying, reshaping, rolling and oiling said roads, and he had completed a number of sections of the roads at the time of the accident. Davis performed the work according to his own methods. He furnished his own machinery, tools, equipment, material and men, and he had full and complete control of the work and men. Westmoreland Heights did not attempt to control or supervise the work in any way, although its president, Mr. Baker, spent a short time there each day for the purpose of satisfying himself that Davis was performing his contract in a workmanlike manner.

At the time of the accident, September 18, 1927, Volney B. Martin lacked a little more than a month of being 21 years of age, and had finished his junior year at the University of Tennessee. His father had given him a gray Moon roadster with rumble seat. He had on several occasions driven through Westmoreland Heights, but at the time of the accident he did not know that the roads therein were being repaired and oiled.

A Miss Elizabeth Price of Texas was visiting a Mrs. Todd of Knoxville, who lived near the University of Tennessee in Knoxville. Young Martin was acquainted with Miss Price, and at about 8:00 on the evening of September 18, 1927 (Sunday) he called for her at

the home of Mrs. Todd. She immediately got into his car, the Moon roadster, and they started for a drive—Martin, of course, doing the driving. They reached Westmoreland Heights about 8:30 P. M. and entered it through the main eastern entrance from Ebenezer Pike, a county highway. The road onto which they entered was Sherwood Drive, and it extended from said entrance in a westerly direction for some miles. At a point about 2100 feet west of said entrance the Stone Mill Road branched off from Sherwood Drive—thus making a "Y."

Young Martin and Miss Price followed Sherwood Drive about a quarter of a mile past the point where Stone Mill Road branched off. Here they met with the accident involved in this suit.

It seems that going west on Sherwood Drive the home of Mr. Geisler was the last house in the subdivision, although said subdivision extended a considerable distance further west. It seems also that Davis had repaired (but not oiled) Sherwood Drive from the point where Stone Mill Road branched off to a point just west of Mr. Geisler's driveway, but it does not appear just when Mr. Davis intended to oil this strip.

It seems that from the point just west of Geisler's driveway to the western end of Sherwood Drive, Mr. Davis had scarified, reshaped and rolled Sherwood Drive and was ready to begin putting on the oil when he quit work on the day before the accident. In fact he intended to begin putting the oil on this strip on the following Monday morning. When they quit work Saturday afternoon (before the Sunday of the accident) he put a large wooden "horse" across the western end of Sherwood Drive, thus closing it at that end, and stretched a steel wire cable across said Sherwood Drive at the point just west of Geisler's driveway. This steel wire cable was about three feet above the roadway. His object in putting these obstructions across said roadway was to prevent cars from passing over it and damaging it before he could put on the oil or tar.

When young Martin and Miss Price reached the cable they did not see it. They were running about 12 or 15 miles per hour. The cable was small but was of steel wire and was securely fastened at both ends to large trees on both sides of the road. It was about three feet above the center of the road along which they were travelling. The motormeter on the top of the radiator first struck the cable and was knocked off. Then the windshield and steel supports thereof struck the cable. The windshield was broken and the supports were bent back. Martin's head and face came in contact with the cable and he was knocked unconscious and severely injured. The top of the car was torn off. The car continued moving forward and Miss Price caught the steering wheel and finally stopped it in the ditch or drain on the left side of the road about 100 feet west of

the cable. The force of the car did not break the cable or cause it to become detached from the trees.

There was a curve in the road about 200 feet east of the cable and from this curve to the cable the road was straight, but was slightly down hill in the direction Martin and Miss Price were going. There were trees on both sides of the road at the cable. The leaves were still on these trees. The night was dark and it was drizzling rain, and the small size and color of the cable made it difficult to see, although the headlights on Martin's car were burning brightly.

Young Martin testified that he did not know that the roads were being reconstructed; that he saw no "road closed" signs anywhere along Sherwood Drive; that Sherwood Drive up to the point of the accident was smooth and that there was nothing about it to cause him to think that he was travelling along a road which was being repaired; that as he approached and struck the cable he was running about 12 miles per hour and was on the lookout ahead; that it was a dark night and drizzling rain and that the trees made it darker at the point of the accident; that the curve and slope in the road and the fact that the cable was higher than his headlights made it still more difficult for him to see the cable; that he was in the center or slightly to the right of the center of the road when he struck the cable; that he did not see the cable which was small and dark colored; that there was no light on the cable—not even an unlighted lantern on it; that there were no tree stumps, laps, roots, limbs or other obstructions on the road under or near the cable and that he ran over none—the cable being the only obstruction—and he could not see it.

In practically all of the foregoing statements young Martin was corroborated by other witnesses. Miss Price testified that they were running about 12 or 15 miles per hour; were both on the lookout ahead and could not see the cable; that they saw no "road closed" signs and were not aware of the fact that they were travelling a road which was being repaired; that when they struck the cable they were in about the center of the road; that there was no lantern on the cable; and that there were no stumps, laps, roots, limbs or other obstructions in the road and that they ran over none. The sheriff of Knox County was driving somewhere near Westmoreland Heights and saw the ambulance going to the scene of the accident. He followed it (taking the same course that Martin had taken) and testified that he saw no "road closed" signs or other indications that the road was closed; that there were no stumps, laps, roots, limbs or other obstructions in the road; that there was an old rotten stump on the side of the road and that he examined it and saw that it had not been run over; and that the tracks of the car showed that

it had not gone over to the side of the road after it had gone under the cable.

Dr. Olin W. Rogers testified that either one or two nights before the accident he drove his car to the point of the accident along the same route that Martin went; that he saw no "road closed" signs and that the only obstruction he saw before he reached the cable was a log with some brush around it protruding about two and one-half or three feet out into the road; that there was no light on the cable; and that he ran into it and tore it loose at one end.

Mr. Henry Penland testified that at about 7:00 P. M. of the night of the accident he drove his car along the same route that Martin went to the cable; that he saw no "road closed" signs; that there was no light on the cable; that fortunately he saw it in time to bring his car to a stop within about a foot of it; and that he saw no stumps, limbs or other obstructions except the cable.

The defendant and his witnesses testified in substance that he had been putting the cable across the road at the point of the accident for several nights but had been fastening one of its ends insecurely so that if it should be run into no damage would be done— this being the way it was evidently fastened on the night Dr. Rogers ran into it; that he placed tree stumps with roots on them, tree laps, limbs, etc., on the road a few feet in front of the cable; that he always hung a lighted red lantern on it; that about 2:00 or 3:00 o'clock on the afternoon of the day of the accident he (Davis) having received word over the telephone from Judge Webb who lived near Westmoreland Heights that parties with automobiles had torn down and brushed aside his obstruction or barricade and were going over the road, went to the place of the accident, pulled the tree stumps, laps, limbs, etc. back onto the road and securely tied the cable to trees at both ends; that he filled a red lantern with oil and hung it on the cable; that he arranged with Mr. Geisler to light it just before dark; that Geisler lighted it at 5:50 P. M.; that it was burning as late as 8:00 P. M.; that the tracks of Martin's car showed that just before he reached the cable he turned to his left into the ditch or drain at the side of the road and attempted to go around the tree stumps, laps, limbs, etc. which Davis had put in the road under the cable; that there was a "road closed" sign at the main entrance through which Martin drove onto Sherwood Drive; that at the forks of Sherwood Drive and Stone Mill Road he had put a wooden "horse," 18 feet long with a "road closed" sign on it in the center of said forks; that this "horse" did not actually block either of said roads as he could not block them because it was necessary that the people living on them be able to drive over them to their homes; that he put said horse in the center of said forks for the purpose of notifying outsiders that said roads should not be

driven over; that his foreman had seen young Martin driving over the roads in the daytime about a week before the accident and had stopped him and told him to stay off the roads as they were being repaired.

There are several observations which we think should be made with reference to the defendants' evidence. The "road closed" sign which defendants claim was at the entrance to Sherwood Drive seems to have been a small sign on the ground either at the foot of one of the stone structures or on the side of the road. It is doubtful to us from the defendants' own evidence whether this sign could be seen at night by a person driving a car onto Sherwood Drive. As to the wooden "horse" at the forks of Sherwood Drive and Stone Mill Road, some of defendants' own evidence tends to show that this "horse" was not in the center of the forks but was so placed as to block only Stone Mill Road. While defendants' evidence does tend to show that Davis had placed some tree stumps, roots, laps and limbs in the road in front of the cable, yet defendants' own witnesses vary widely as to the height of these obstructions—one witness stating that they were only eight or ten inches high. And all of these witnesses were in conflict with the testimony of young Martin, Miss Price, Sheriff Anderson and others who denied that there were any tree stumps, roots, laps, limbs, etc., in the road. This conflict cannot be reconciled on the theory that on the Sunday afternoon and early evening of the accident persons pushed the tree stumps, laps, roots and limbs out of the road so as to drive through, because after 2:00 or 3:00 o'clock on that afternoon when Davis claims he pulled the stumps, roots, laps and limbs back across the road and securely fastened the cable at both ends, it was impossible for any car to pass. They could not pass the cable. And Geisler's testimony that there was a lantern fastened to the cable and burning as late as 8:00 P. M. is in direct conflict with the testimony of Mr. Penland, young Martin, Miss Price, and others. Defendants' witnesses say that after the accident they picked up a broken lantern a few feet west of the cable. This lantern was introduced in evidence and appeared to have an old split wick in it. Moreover, the fact that plaintiff's witness, Mr. Penland, testified that at 7:00 P. M. on the night of the accident there was no light on the cable, indicates that the lantern (if Davis in fact put one on the cable and Geisler lighted it as they claim) on account of a defective wick or lack of oil burned only a short while. Young Martin denied that Davis' foreman or any one else stopped him and told him to stay off the roads while they were being reconstructed, etc. He testified that he had been on a visit in Kentucky; that he had not been in Westmoreland Heights for a considerable length of time prior to the accident; that he did not know and saw nothing to indicate that

said roads were being rebuilt; that he had seen the signs and newspaper advertisements inviting the public to drive through Westmoreland Heights, day or night, and that he thought it was entirely all right for him to drive through.

The record in these cases contains more than eight hundred pages, and it is impossible for us in this opinion to state all of the evidence, but it seems to us that the foregoing is sufficient to show that the testimony of the plaintiff and his witnesses on the one hand, and the testimony of the defendants on the other cannot be reconciled upon any hypothesis or theory relieving Davis from negligence which proximately caused the accident. If the testimony in behalf of plaintiffs is given credit then Davis was clearly guilty of negligence, and we think there was such a conflict in the evidence as justified the trial court in overruling Davis' motion for peremptory instruction, and in submitting the question of his liability to the jury. Neither do we think that under plaintiffs' evidence, young Martin was guilty, as a matter of law, of such negligence as proximately contributed to his injuries.

It is true that the driver of an automobile is required by the law to drive at such a rate of speed that he can stop within the distance that his lights will disclose objects ahead, etc. West Const. Co. v. White, 130 Tenn., 520; Knoxville Ry. & L. Co. v. Van Gilder, 132 Tenn., 487; Cleveland Transfer Co. v. Clark, 6 Tenn. App., 364. But we do not think that the ruling laid down in these cases should be extended so as to bar the plaintiffs' right to recover in the cases at bar. Young Martin was in a quiet residential section where he did not suspect danger; he was driving along an apparently smooth macadam road; he was running only 10 or 12 miles per hour; his headlights were burning properly, and he was on the lookout ahead. To hold that because he did not see a small, dark colored and unlighted steel wire cable stretched across the road he was guilty of such contributory negligence as barred his right to recovery as a matter of law would be carrying the doctrine of the above cited cases much further than it was even intended that it should be carried.

So, as stated, we think the trial court did not commit reversible error in overruling the defendant, Davis' motion for a directed verdict.

None of the officers of Westmoreland Heights knew that Davis had put the cable across the road or that he intended doing so, and we think that Davis fell within the usual definition of an independent contractor. But nevertheless we think that Westmoreland Heights was properly held liable for Davis' negligence. It owned the property; it built and owned the roads; it invited the public to use said roads; it knew that the public was using them, and we do not think

it can avoid liability on the ground that Davis was an independent contractor. As long as it left said roads open to and in use by the public we think it owed the public as high a duty as municipal corporations owe the public with reference to their city streets. And it has many times been held that municipal corporations cannot escape liability for such accidents as the one involved in these suits on the ground that an independent contractor was doing the work. Mayor v. Brown, 9 Heisk., 1. See also cases collated in the notes in 65 L. R. A., 620; 65 L. R. A., 833; 66 L. R. A., 119; and 17 L. R. A. (N. S.), 758.

Of course it can be argued that Martin was not hurt by reason of the work Davis was doing in the road; that he was injured by the negligent erection of and failure to illuminate a barrier or obstruction which was put up for the purpose of preventing the public from going over that portion of the road upon which the work was being done; and that the erection and illumination of said barrier or obstruction was merely collateral to the performing of the work which Davis contracted to perform. But the proper performance of the work contracted for required the erection of barriers or obstructions in the road, and the erection of such barriers and obstructions in a road used by the public is extremely dangerous to the public if such barriers and obstructions are not properly put up and lighted—and Davis, according to plaintiffs' evidence, did fail to properly put up and light the barrier which injured young Martin. We think the contract clearly contemplated the erection of dangerous structures in the road which, if not properly lighted, would probably prove injurious to persons using the roads. While the question of the liability of Westmoreland Heights is not entirely free from doubt, yet we think that our holding against it is supported by the same underlying principles upon which the above cited cases against municipalities were decided. Its assignment of error raising the question of independent contractor, etc., will therefore be overruled.

Both defendants assign that both verdicts and judgments were excessive. One of young Martin's eyeballs was ruptured and said eye had to be taken out. He now wears a glass eye. His upper jaw bone was broken and shattered. His nose was broken and the bone pulled loose from the other bone to which it was fastened, the opening being so large that a doctor testified that he could put a probe or his little finger up into the frontal sinus on either side. The sinus were damaged and he still had a discharge of pus from them at the time of the trial. His upper lip was cut all the way through. He was either unconscious or only semi-conscious for 10 days. He was in the hospital two weeks or more and after he was taken home he was compelled to have the attention of a trained nurse for six weeks or

more. His injuries were severe and permanent. We think the verdict and judgment in his case was not excessive. In fact it seems to us that the defendants' attorneys won a victory in holding the verdict and judgment in his case down to $4,800. Neither do we think the $1,200 verdict and judgment in favor of the father, J. B. Martin, was excessive. His evidence shows that he had paid or obligated himself to pay between $1800 and $2000. The assignments are therefore overruled.

After the jury had deliberated for some time it came back into court and announced that it had agreed upon the following verdicts, i. e., in favor of Volney B. Martin and against O. M. Davis for $600; in favor of Volney Martin and against Westmoreland Heights for $4,200; in favor of J. B. Martin and against O. M. Davis for $150; and in favor of J. B. Martin and against Westmoreland Heights for $1050. The bill of exceptions then recites that at the request of O. M. Davis, and after said request had been submitted to and approved by counsel for all parties, the court charged the jury as follows:

"You may render your verdict against either of the defendants or against both jointly. If you find under the evidence that one of the defendants is liable and the other is not liable, you may return a verdict against that defendant you find liable, and find in favor of the defendant you find not liable, or you may return a joint verdict against both defendants. But the Court does not, of course, intimate to you what your verdict should be."

Thereafter, as stated, the jury returned a verdict against both defendants in favor of Volney B. Martin for $4800, and a verdict against both defendants in favor of J. B. Martin for $1200.

Both defendants assign the giving of the above quoted charge to the jury as error—the ground being that under it the jury must have thought that if they reached the conclusion that one of the defendants should be held liable they were entitled to render a verdict against both.

In the first place the charge having been requested by one of the defendants and approved by the other, it does not seem to us that either defendant is entitled to assign error on it. In the next place we do not think the jury could have gotten the impression that if they thought that one defendant should be held liable they could render a verdict against both. The assignments are therefore overruled.

There are 17 assignments on behalf of O. M. Davis and 7 assignments on behalf of Westmoreland Heights based upon excerpts from the court's charge to the jury and upon his refusal to charge the jury as requested by the defendants. To deal with these assignments separately would extend this opinion beyond reason. We have examined these assignments and do not think that any of them constitute a sufficient ground for reversal of these cases.

With reference to Volney B. Martin being a trespasser, licensee, etc., it seems to us that the trial court amply protected the defendants by telling the jury in substance that if Volney B. Martin was told to stay off the roads while they were being reconstructed, or if he knew that said roads were closed, or if he could by the exercise of ordinary care have known that said roads were closed, neither of the plaintiffs were entitled to recover.

It results that in our opinion there were no errors in the judgments of the lower court and the same will be affirmed with costs.

Portrum and Snodgrass, JJ., concur.