LOUISVILLE & N. R. CO. v. CANTRELL et al.—160 S. W. (2d), 444.

Middle Section.   February 16, 1942.

Petition for Certiorari denied by Supreme Court, April 4, 1942.

530

Seay, Stockell & Edwards, of Nashville, for plaintiff in error.

Norman Farrell, W. L. Schram, and John T. Allen, all of Nashville, for defendants in error.

HOWELL, J. This suit was brought by Will C. Cantrell and by Frank Cantrell, a minor by his next friend Steve Taylor, for damages for the death of their wife and mother respectively, a colored woman named Helen Otelia Cantrell, about twenty-three years of age, who was killed on June 22, 1940, by a freight train of the defendant Louisville & Nashville Railroad Company on the right of way of the railroad at a point near Pilot Knob, Tennessee.

The declaration alleged that the servants and agents of the defendant negligently and wrongfully ran the locomotive and train over Otelia Cantrell and killed her; that the defendant, and its agents and servants, failed to ring the bell or sound the whistle or keep a lookout ahead and when the deceased Otelia Cantrell appeared on the track they failed to sound the alarm whistle or any other whistle and failed to apply the brakes or use other means to stop the train and prevent the accident.

The defendant first interposed two pleas, one of not guilty and the other a plea of accord and satisfaction. The plaintiffs demurred to the second plea and this demurrer was sustained by the trial Judge. The defendant then filed additional pleas in which it denied that the injuries were caused by its negligence and that it had failed to perform its statutory duties as alleged in the declaration. It pleaded further and averred that the proximate cause of the accident was the negligence of the deceased in suddenly placing her person on the defendant's track in front of the train and that her injuries and death resulted from her own wilful conduct in intentionally and suddenly placing her person upon its track immediately in front of its train.

At the close of all the testimony the defendant moved the Court for a directed verdict in its favor and its motion was overruled.

The case was tried by the Circuit Judge and a jury on June 11, 1941, and resulted in a verdict for the plaintiffs for $5,000.

Upon the motion for a new trial the Circuit Judge overruled the motion and suggested a remittitur of $1,000. This was accepted under protest and a judgment was entered for $4,000 against the defendant.

The defendant has properly perfected its appeal in error to this Court and has assigned errors as follows:

"1. The Court erred in sustaining the demurrer of the plaintiffs below to the plea of accord and satisfaction filed by the defendant below, and in excluding the defense of accord and satisfaction. (See Motion for New Trial, Tr. 117, Action of Court on Demurrer, Tr. 8.)

"2. There is no evidence to support the verdict of the jury. (See Motion for New Trial, Tr. 117.)

"3. The Court erred in overruling the motion of the defendant below made at the conclusion of all of the evidence in the case to peremptorily instruct the jury to return a verdict in favor of the defendant below and in not directing a verdict for said defendant. (Motion for New Trial, Tr. 117.)

"4. The verdict of the jury is so excessive as to evince passion, prejudice or caprice upon the part of the jury. (See Motion for New Trial, Tr. 118.)

"5. The Court erred in charging the jury as follows: 'Now, in a case like this, where a violation of this particular statute is relied upon and the defendant is charged with a violation of it as the proximate cause of the death of the deceased, the burden of proof is upon the defendant and they must show, by a preponderance of the evidence that they complied with statute.' (See Motion for New Trial, Tr. 118.)

"6. The Court erred in charging the jury in accordance with plaintiffs' Special Request No. 3, as follows: 'Plaintiffs' Special Request No. 3. The Railroad Company insists that the deceased put herself on the railroad track with suicidal intent. Plaintiff denies that this is true. However, I charge you that even if the deceased did go upon the railroad track with suicidal intent, it was nevertheless the duty of the Railroad, as soon as she appeared upon the track to at once observe all statutory precautions toward her as it would have to observe toward any other person.' (See Motion for New Trial, Tr. 118.)"

The first assignment of error questions the action of the trial Court in sustaining plaintiffs' demurrer to the pleas of accord and satisfaction. After the death of Otelia Cantrell, Clarence Malone, a resident of Sumner County, Tennessee, qualified as administrator upon her estate and on August 7, 1940, the defendant company paid him as such administrator $260.65 and this amount was accepted by him "in full compromise, settlement, discharge and satisfaction of all claims, damages, or causes of action of every character whatsoever, which said Administrator or the estate of Helen O. Cantrell had as a result of the injuries to and loss of life, and damage to the property of said Helen O. Cantrell, deceased, who was fatally injured at or near Pilot Knob, Tennessee, on the 22nd day of June, 1940."

Section 8236 of the Code of Tennessee is as follows: *"Right of action for wrongful injuries resulting in death or for wrongful killing does not abate, but passes to whom.*—The right of action which a person, who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by his death, but shall pass to his widow,

and, in case there is no widow, to his children or to his next of kin; or to his personal representative, for the benefit of his widow or next of kin, in either case free from the claims of creditors.''

Section 8239 is as follows: *"Suit in name of husband or administrator of deceased wife.*—A suit for the wrongful killing of the wife may be brought in the name of the husband for the benefit of himself and the children of the wife, or in the name of administrator of the deceased wife, or in the name of the next of kin of the wife.''

Section 8241 of the Code is as follows: *"Damages for wrongful death of wife and mother go to husband and children; husband's share goes to his next of kin upon his death.*—The damages which may be recovered for the wrongful killing of any married woman shall go to the surviving husband and children of the deceased equally, the husband taking a child's share, and if any child be dead leaving descendants, such descendants shall take the deceased child's part. If there are no children nor descendants of children, then the damages shall go exclusively to the husband. If the husband shall die after the cause of action accrued and before recovery is collected, then his share shall go to his next of kin.''

In the case of Cummins v. Woody, 177 Tenn., 636, 152 S. W. (2d), 246, a settlement made with an administrator was set aside and the legal father of a child permitted to intervene, and special Justice Alan M. Prewitt in his opinion on pages 642 and 643 of 177 Tenn., on page 248 of 152 S. W. (2d), said:

''By the express provisions of Code, section 8236, it is provided that the right of action shall not abate but shall pass to the widow, and, in case there is no widow, to the children or the next of kin. In other words, where the former act provided that the right of action should pass to the widow or children, the Code provisions extend the reservation to the next of kin in the same category as the children. The reservation in favor of the next of kin is prior in order of enumeration to the reservation in favor of the personal repesentative for the benefit of the widow or next of kin. It is a clear expression by the legislature that the reservation should be extended to the next of kin in the same manner as the previous reservation including the widow, and we know of no reason why the provision should not be fully recognized by the courts.

''Under the law the father had the exclusive right to compromise the claim, and the attempt at compromise with the administrator was inoperative against him. . . .

''In our view of the case, we hold that John C. White had the right to institute suit in his own name as next of kin of the deceased child, or he could have instituted suit in the name of the administrator for his use and benefit. We are further of the opinion that under the facts of this case it was proper for the court to permit him to intervene in this suit and become a party plaintiff therein, and we

are also of the opinion that the court properly granted a new trial under the showing in this cause.''

In the case of Spitzer v. Knoxville Iron Co., 133 Tenn., 217, on page 220, 180 S. W. 163, on page 164, it is said: ''We feel constrained to hold that the widow had the legal right to make the compromise. This seems to us a necessary consequence of our prior decisions construing the statutes. The substance of these decisions is that the widow's right of action is prior and superior to that of the administrator; that the latter cannot sue until she waives her right, albeit in addition to an express waiver she may effect a waiver by merely permitting his suit to stand without objection on her part; that she may compromise the demand at any time before the administrator, pursuant to her waiver, has brought a suit, but not afterwards; that likewise she may compromise the claim before suit brought, or after a suit brought by herself as widow at any time, regardless of the protest of her children; that after suit has been brought by the administrator the action can be compromised only by consent of the widow and children. Greenlee v. [East Tennessee, V. & G.] Railroad Co., 5 Lea, 418 [73 Tenn., 418]; Stephens v. [Nashville, C. & St. L.] Railway, 10 Lea, 448[78 Tenn., 448]; Webb v. [East Tennessee, V. & G.] Railway Co., 88 Tenn., 119, 12 S. W., 428; Holder v. [Nashville, C. & St. L.] Railroad Co., 92 Tenn. [141], 142, 20 S. W., 537, 36 Am. St. Rep., 77; Prater v. [Tennessee Producers'] Marble Co., 105 Tenn., 496, 58 S. W., 1068; Railroad v. Acuff, 92 Tenn., 26, 20 S. W., 348.''

There is no suggestion of any fraud in connection with the settlement made in this case and therefore those cases in which the setting aside of compromise agreements are involved and cases in which minors seek to repudiate contracts in which the rule is that the consideration must be returned, do not apply here. The record does not show that either of the plaintiffs in this case got any part of the $260.65 that was paid. This assignment of error is therefore overruled.

The second and third assignments of error are that there is no evidence to support the verdict of the jury and that the court erred in not granting defendant's motion for peremptory instructions.

The deceased Otelia Cantrell lived on a hill near the right of way of the defendant railroad and there was a path that led down from the house in which she and her mother lived to and across the right of way and railroad tracks. For some unexplained reason on the day of the accident the deceased walked down to the railroad. She was seen by Jim Hockett, one of the plaintiffs' witnesses, who heard some one crying and was asked by J. H. Parkey, who was in a field nearby, to go and see who it was. The witness called to her saying ''Is that you Otelia?'' and she answered ''Yes, why?'' Hockett then went back to where Parkey was at the side of the railroad. Jim Hockett then testified in part as follows:

"A. I went back down there where Mr. Jim was and commenced talking to him.

"Q. Did you hear the train coming? A. Yes sir, I heard the train.

. . . . . . .

"Q. You heard the train whistle before you even got off the right of way, did you? A. I heard the train whistle before it ever got in sight.

"Q. After you got off the fill to let the train get by, or while you were getting off the fill and getting out of the way did you hear the train whistle? A. While I was getting out of the way?

"Q. Yes. A. No sir.

"Q. When did it whistle? You heard it whistle, didn't you? A. Yes sir, it whistled after it got along even with me.

"Q. Now, after Otelia got on the track, did it whistle loud? A. Yes sir, it blowed then.

"Q. Did it blow rapidly? A. Yes sir."

J. H. Parkey, a witness for defendant, was working in a field nearby and at the time of the accident was resting his team and talking to the colored boy Jim Hockett, when he heard some one crying. He sent the boy up there to see who it was.

He then testified in part:

"Q. Later did you get sight of anyone that was crying up there? A. Yes sir.

"Q. Where was that? A. Well, I couldn't see the rails, but it was right at the point of that accident.

"Q. You couldn't tell whether she was on the track or whether she was,—A. I couldn't tell, I couldn't see the rails, I couldn't tell whether she was standing on the track or whether she was on the far side of the track, or whether she was sitting down on the track, from where that sounded.

"Q. What part of her body were you able to see? A. From her waist up.

"Q. From her waist up? A. Yes sir.

"Q. What was she doing? A. Waiving her arms and hands, crying.

"Q. And crying? A. Yes.

"Q. Which way was she facing? A. North.

"Q. The direction in which the train came? A. Facing the approaching train on the track.

"Q. How close was the train to her at the time you saw her? A. Well, I wouldn't say exactly because it excited me to see her in that place and position, but it could't have been far off because it wasn't but just seconds until the train cut my view from her.

"Q. What blowing of the whistle did you hear? A. Well, it commenced blowing before I even stepped out there where I could see her.

"Q. Do you know how far back it started blowing? A. I would be afraid to say, but I imagine it was about as far from me as I was from her.

"Q. Did it blow repeatedly? A. Yes sir.

"Q. Did it blow loud, or otherwise? A. Yes sir, quick, short blasts, the best I remember.

"Q. Have you ever heard the stock alarm, when stock gets on the track? A. Yes.

"Q. Was it that kind of an alarm? A. Similar to that.

. . . . . . .

"Q. Wait a minute, before we get to that. You say the train commenced blowing these sharp whistles about half way between the end of the bridge and the cut, which you say was 800 or 900 feet? A. I imagine about that, approximately that.

"Q. When that whistle was blowing, had you seen the woman before that time? A. No sir.

"Q. How long after that was it that you saw her? A. It wasn't but just a few seconds.

"Q. Just a second. Where was she then? A. She was where I stated at first.

"Q. You told Mr. Stockell, of course, you had to look over that high bank or the fill and you only saw the upper part of her body? A. Yes sir, that is right.

"Q. From her shoulders up? A. That is right.

"Q. Did she look to you like she was on the track? A. I couldn't tell whether she was on the track or not, but from the maneuvers of the train whistling, I just presumed she was on the track.

"Q. At the time the train was blowing those sharp, staccato whistles there, was it slowing down? A. It didn't seem to me it was.

"Q. Was it ringing the bell? A. I don't remember about any bell.

"Q. All you remember is the whistles, you remember the whistles? A. Yes sir."

Robert Lovett, a witness for the plaintiffs, lived near the scene of the accident and says that he was on his way home "and just as I got to my gate, the train it came along, blowing;" that the train was about half way between the bridge and the cut and it started blowing. He further said it seemed like he heard the brakes "screeching," and that if any brakes were put on before the whistle was blown he didn't hear them, but he did hear the bell ringing. This witness did not see the accident and says it was about a quarter of a mile from where he was.

The record shows that the distance was 869 feet from the end of the bridge to the scene of the accident and the railroad was straight and there was nothing to obstruct a view in either direction. The pictures of the scene exhibited by plaintiffs show this very clearly.

Lewis Violet, another witness for plaintiffs, was in a field near the scene of the accident cutting wheat and said he heard the train whistle and when asked if he heard the brakes put on said: "If I did, I didn't pay any attention to it." He then said:

"Q. What first attracted your attention to the train, anyway? A. The train blowing there, and we had a team stopped right there, a team on the binder and I thought they was trying to scare the team when they was blowing the whistle.

"Q. Did you ever hear any bell ring? A. I don't remember if I did.

"Q. There was no whistle until they got right opposite where you was in the field? A. Right opposite where I was."

And again he said:

"Q. Your first attention to the train was attracted by those loud blasts of the whistle? A. That is right.

"Q. They were unusual, weren't they, very loud, like when stock is on the track? A. That is right.

"Q. You have heard those, that stock alarm when stock is on the track, haven't you? A. Yes sir.

"Q. Just loud blasts of the whistle, one right after another, that is what you heard? A. That is right.

"Q. That is what attracted your attention? A. Yes."

Will Cantrell, Sr., testified for the plaintiffs and said he was in a field north of the trestle probably half a mile and heard the train go by, did not hear any brakes being applied but did hear the bells ringing and the whistle blowing; that he first heard the whistle blow before it went over the bridge.

C. P. Lacefield, a witness for the defendant, was the engineer in charge of this freight train and says that he was running toward Nashville with about fourteen coal cars in his train, and he describes the accident as follows:

"Q. What did you first see near the track, Mr. Lacefield? A. The first, I could see an object at the north end of the cut but I couldn't tell, right at the instant, what it was. As I drew nearer I realized it was a human being and after I crossed the bridge, why, they turned around; was sitting on the end of the ties as I crossed the bridge, and as I crossed the bridge, they turned themselves they flopped the head and shoulders, face down.

"Q. What did you do, Mr. Lacefield, when she threw herself across the rail? A. I began to blow the alarm signal.

"Q. What did you do with regard to applying your brakes? A. I put them on immediately.

"Q. Did you put them on in emergency? A. Yes sir.

"Q. That is the greatest application of the brakes that you can give, is it? A. That sets them to the fullest extent.

"Q. You gave it the works? A. I gave it the works, yes sir,

"Q. Were your brakes in good condition, good operating condition? A. Absolutely.

"Q. Which side of the cab were you on? A. On the right side, the west side. I was on the right side of the cab, on the west side of the track.

"Q. Mr. Lacefield, did you state whether or not your brakes were in good operating condition? A. They were.

"Q. They were in good operating condition. A. Yes sir.

"Q. How fast were you going? A. In my judgment, 45 miles an hour.

"Q. You say, 45 miles an hour? A. Yes.

"Q. Mr. Lacefield, can a train, going 45 miles an hour as that was going, stop in a short distance, or does it require some distance to bring 14 cars and an engine and tender to a stop? A. A train like I was hauling, of coal, heavy loads it takes quite a bit to stop it. I had mostly coal and it takes quite a long time to stop those heavy loads, longer than it does lighter loads or empties.

"Q. Was there anything else, Mr. Lacefield, that you could have done, to have prevented that accident? A. I don't think there was.

"Mr. Farrell: Wait a minute.

"Mr. Stockell: That is the words of the statute.

"Mr. Farrell: He can state what he did and that is the end of it.

"The Court: The statute says, sound the whistle, apply the brakes and do everything possible to avoid the accident.

"Mr. Stockell: I want to know if there was anything else he could have done.

"The Court: I expect that is competent.

"Mr. Stockell: I always have asked it.

"Mr. Farrell: I haven't had the pleasure of trying any of these cases with you before, I didn't know what you had been doing.

"Mr. Stockell:

"Q. Was there anything else you could have done to avoid the accident? A. No sir, not anything else. If it had been my own family, I couldn't have done anything else.

"Q. Was it possible to stop the train before striking that woman? A. No sir."

We have referred to the substance of the testimony of all the witnesses who were at the scene of the accident, and from this record, we can see no justifiable excuse for the deceased, Otelia Cantrell, not seeing this approaching engine and train or hearing the warning whistle that all the witnesses said was blowing and exercising due care for her own safety.

The mere negative statements of witnesses for the plaintiffs that they did not hear the brakes being applied as they appear in this record, is not sufficient to establish negligence on the part of the defendant's servants and agents.

If this deceased did not commit suicide and had been exercising ordinary or reasonable care for her own safety, she could have seen this train for over 800 feet and could have heard the whistle blowing.

The general rule is that negligence is a matter to be determined by the jury, except where there is but one conclusion that can be drawn from the testimony by fairminded men, in which case it becomes a matter of law for the Court. Only one conclusion can be drawn from the testimony in this case and that is that the accident was due to the wilful conduct of the deceased rather than any failure to observe statutory precautions by the defendant, and the trial Judge should have granted the defendant's motion.

The uncontradicted proof shows that the railroad observed all of the statutory requirements and is not liable. There is no evidence upon which a verdict for the plaintiffs could be based.

There is no material conflict in the evidence. All of the witnesses say they heard the whistle blowing. The negative statements of the witnesses that they did not hear the brakes applied and that they do not remember hearing any bell ringing do not rise to the dignity of a conflict with the positive testimony that the brakes were applied and the bell rung.

The law is well settled and is fully set out in Michie's Digest, Vol. 15, page 351 et seq.

In the case of Jackson v. Texas Co., 10 Tenn. App., 235, on page 245, Crownover, J., sets out the cases in which a verdict should be directed as follows: "Where the case involves only questions of law; where but one reasonable conclusion can be drawn from the proof adduced; where there is no disputed evidence on the material points; where, although the evidence is conflicting on minor matters, a conceded fact shows that the evidence on one side cannot be true; or, where by giving to the opposite party the benefit of the most favorable view of the evidence the verdict against him is demanded, a verdict should be directed. 38 Cyc., 1565-1567; [Nashville, C. & St. L.] Railroad v. Justice [5 Tenn. Civ. App. 69], 5 Higgins, 69."

The second and third assignments of error are therefore sustained. It is not necessary to discuss the remaining assignments as to the amount of the verdict and the charge of the Court.

It results that the judgment of the lower Court is reversed and plaintiffs' suit dismissed at their cost.

Reversed.

Crownover, P. J., and Felts, J., concur.