TOWN OF CLINTON et al. v. DAVIS et al.—177 S. W. (2d) 848.

Eastern Section.   November 2, 1943.

Petition for Certiorari denied by Supreme Court, February 5, 1944.

30

Chas. H. Smith and J. H. Hodges, both of Knoxville, for plaintiffs in error.

A. L. Fox and J. M. Underwood, both of Clinton, for defendants in error.

BURNETT, J. Carter Leonard Davis, a minor twelve years and seven months of age, brought suit for damages on account of injuries received by him when he came in contact with an uninsulated high tension wire carrying 6900 volts of electricity while climbing a sycamore tree, after sycamore balls, located on the highway right-of-way in front of his home. The electric wires were owned and operated by the plaintiffs-in-error, Town of Clinton, Tennessee, and Clinton Power Commission, who were defendants below. His father also sued to recover medical and hospital expenses and for loss of his son's services resulting from the accident. The cases were tried together and resulted in verdicts and judgments for the respective plaintiffs. We have before us the consolidated appeals of the defendants from the two judgments.

The only alleged error relied upon in plaintiffs-in-error's assignments on appeal and in their brief is that

the trial judge refused to grant defendants' motion for a directed verdict in each case at the close of all the evidence and that the judgments are excessive. We have, therefore, no occasion to consider the charge to the jury or rulings during the progress of the trial.

The father's action being dependent upon the right of the son to recover, we shall hereafter refer to the son as the plaintiff and the Town of Clinton, Tennessee, and Clinton Power Commission as the defendant.

On June 21, 1941, the plaintiff lived with his father, mother, two brothers and a sister in a rented home located on Lost Bottom Road in Anderson County, Tennessee, about one mile south of Clinton, Tennessee. The Lost Bottom Road runs in a general westwardly direction from U. S. Highway 25W. At the intersection of Lost Bottom Road and U. S. Highway 25W is a small neighborhood store. The plaintiff's home is less than 500 feet from this store. In the neighborhood in which the plaintiff lives are twenty or twenty-five other homes in which children live. Not far from the plaintiff's home is a school which is located on Lost Bottom Road and is attended by 300 or 400 students. The defendant is the owner of an electric power line that runs down the Lost Bottom Road in the right-of-way across the road in front of the plaintiff's home. This electric power line is strung on poles about 190 feet apart. The poles are 30 feet long and are set 4½ feet into the ground. On each pole there is a fin crossarm 44 inches in length and 8 inches from the top of the pole. On these crossarms, attached to insulators, are two uninsulated copper wires spaced 36 inches apart, one of which carries no voltage and the other carries 6900 volts of electricity. This is the primary circuit.

Below the primary circuit there is a secondary circuit consisting of three wires strung from pole to pole and attached to a vertical rack fastened to each pole so that the wires are one above the other. It is 24 inches from the bottom wire to the top wire of the secondary circuit. It is 4½ feet from the top wire of the secondary circuit to the wires on the crossarms composing the primary circuit. The middle wire of the secondary circuit is a neutral wire and the top and bottom wires each carry 115 volts of electricity. By connecting the top and bottom wires of the secondary circuit the voltage becomes 230 volts, which is the voltage used in homes which have both electric lights and electric ranges. 115 volts is the voltage used for an electric range without electric lighting and for electric lighting without a range. From this secondary line wires led into the plaintiff's home for lighting purposes only.

The poles to which this line of electric wires is attached are set 4 feet from the fence in the highway right-of-way at the place of this accident. A number of trees of varying sizes are growing up between these poles and under and through these wires. Among these trees is a sycamore tree which is about 35 or 40 feet tall and about 12 inches in diameter at the base. The lower limb of this sycamore tree is a little over 6 feet from the ground. This tree had various vines growing up around it and it was bearing sycamore balls. These electric wires ran through the branches of this sycamore tree. The branches and limbs were grown up around the secondary line but some of the limbs had been cut from around the primary line. The testimony is conflicting as to how near the primary line came to the trunk of the tree. The testimony is likewise conflicting as to whether or not these

primary wires could be seen in this tree from the ground under the tree. Where the wires ran through the tree the primary wires were about 23 feet above the ground while the secondary wires were some 4 feet lower. The plaintiff knew the wires ran along the road but says he thought they went around the tree. There are other witnesses who state the location of these wires could not be seen from certain positions in the road. It might be observed that an adult or one going there for the purpose would be much more apt to observe the wires than would a small boy who was intent in his play not knowing or thinking of high tension electric wires. There were no signs or notice that high tension electric wires ran through these trees or were strung on these poles. The fact that these wires ran into the home of the plaintiff and furnished lights therein was not notice to him of their danger.

On the morning of June 21, 1941, the plaintiff and his younger brother were playing under this sycamore tree—throwing sycamore balls at each other. When they ran out of sycamore balls the plaintiff climbed this sycamore tree after more sycamore balls. He had pulled off some balls and was standing on his left foot on a limb near the trunk of the tree holding to another limb with his right hand when he reached out with his left hand, a little above his shoulder, for more balls but remembered nothing after reaching for these last balls. He was barefooted and his only clothing was a pair of bathing trunks.

The only logical assumption is that when he reached out with his left hand after more balls this left hand came in contact with the uninsulated 6900 volt electric wire and he received injuries hereinafter detailed. His small brother called his mother and other neighbors soon

arrived and his unconscious or semi-conscious body was taken from the tree and to the Davis home. The doctor soon arrived and found the plaintiff had received "apparently electrical burns. There were severe burns on the left hand and forearm; on the left knee and thigh; and right thigh; those were third degree burns of the left hand and knee and sole of the foot; in the left hand the bones were exposed and tendons destroyed."

A third degree burn destroys the flesh and tendons and is the severest of burns. As a result of these burns it was necessary to amputate everything on the left hand except the middle finger. The doctor testified at the trial if they had known it would be in the condition it then was they would have likewise amputated the middle finger because the stub would have been more serviceable than the hand was as it was left. The plaintiff was in the hospital 35 days at first and 10 days at a later period. It was necessary to cut skin from parts of the body and graft it to the other parts of the body that were burned. As a result of these injuries the plaintiff suffered excruciating pain, had to lose many months from school and parts of his body were 80 or 90 percent disabled.

The defendant moved for a directed verdict on the grounds "(1) that there was no evidence on which a jury could reasonably find the defendant negligent as alleged in the declaration; and (2) if the defendants were guilty of any negligence, their negligence only created a condition of potential danger and the two independent intervening acts of Carter Leonard Davis, first, in climbing into the sycamore tree, and second, in deliberately reaching for and taking hold of the electric wire, were the proximate causes of the accident and resulting injuries."

■ The measure of care required of an electric company owning and operating high tension electric wires is very clearly and concisely stated by the author of American Jurisprudence in Volume 18 at pages 463 and 464 as follows:

"In view of the deadly and insidious character of high-tension wires and in view of the curiosity of children, their ignorance, heedlessness of danger, and their known love of adventure, the courts have imposed a high degree of care upon persons maintaining electric wires to guard them so that they will not cause injury to children. However, the court cannot make electric companies insurers of the safety of children any more than of others or require of such companies, in the circumstances of their business, a degree of care, prudence, and foresight beyond that which careful and prudent men would exercise in such or like circumstances. Recovery has been denied in some cases where the accident was of such unusual nature that the one maintaining the wires could not have reasonably anticipated and provided against it. (Sec. 68.)

"In the determination of whether or not there is liability to an injured child, each case must, in large measure, depend upon its own peculiar facts; but the place where the injury occurs is a factor which tends to harmonize the decisions. Thus, if the injury occurs in a street or other public place, the circumstances must be very peculiar to relieve the electric company of liability; but if it occurs on the property of the power company, there must be peculiar circumstances to hold the company liable. The situation lying between these two extremes are governed by various shades of legal principle." (Sec. 69.)

■ The cases involving liability of an electric company for injury to children received while climbing trees,

poles and bridges are legion. We have studied a host of these cases from almost every jurisdiction in the United States and England. These cases generally hold that it is the duty of those engaged in erecting and maintaining wires carrying a deadly current of electricity to either properly insulate, guard or elevate the wires to such a height that they are not reasonably accessible when these wires pass through trees, which it should be reasonably anticipated might be climbed by children without knowledge of the danger involved. Chickering v. Lincoln County Power Co., 118 Me. 414, 108 A. 460; Beckwith v. City of Malden, 212 Mo. App. 488, 253 S. W. 17; Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S. W. 233; Lamb v. Consumers Power Co., 286 Mich. 228, 281 N. W. 632; Texas General Utilities Co. v. Nixon (Tex. Civ. App.), 81 S. W. (2d) 250; Erikson v. Wisconsin Hydro-Electric Co., 214 Wis. 614, 254 N. W. 106; Afton Electric Co. v. Harrison, 49 Wyo. 367, 54 P. (2d) 540; Mullen v. Wilkes-Barre G. & E. Co., 229 Pa. 54, 77 A. 1108; Curtis on Electricity, sec. 512. We might sight many more cases to the same effect but do not deem it necessary.

There are one or two cases such as Minter v. San Diego Consol. G. & E. Co., 180 Cal. 723, 182 P. 749, which recognize the duty of an electric company as above stated but refuse to apply the rule to the facts of the particular case. The only jurisdiction in so far as we can find holding to a contrary doctrine is Georgia. These cases are Smith v. Georgia Power Co., 43 Ga. App. 210, 158 S. E. 371; Bridges v. Georgia Power Co., 39 Ga. App. 400, 147 S. E. 589; Brown v. Panrola L. & P. Co., 137 Ga. 352, 73 S. E. 580. We unhesitatingly accept the view of the majority and feel that it is sound. The doctrine adopted by the Georgia decision is not sound.

Judges being human have been inclined to reminisce when considering boyish inclinations and habits. These inclinations and habits are of prime importance in our consideration of the care required of an electric company in the supervision and construction of its high tension wires. One of the soundest statements we have read on this feature of the case was delivered by Mr. Justice Dunn in Chickering v. Lincoln County Power Co., supra, when he said:

"Trees growing about a family home are not primarily for boys to play in. But by climbing a tree a boy would not altogether remove himself from the pale of the protection of the law. In constructing and maintaining a line for transmitting the subtle agency of electricity, no one may with impunity totally disregard the natural habits and childish inclinations of boys at play to climb the dooryard shade trees. Human life is short enough, and its burdens and responsibilities come soon enough, at best. To take from boyhood the legitimate pleasures and adventures of tree climbing would unduly restrict the confines of that memory cherished domain, and lessen life's joys, both there and thereafter." Graves v. Interstate Power Co., 189 Iowa 227, 178 N. W. 376, 378.

A number of courts have placed liability on the electric company under the doctrine of attractive nuisance. That doctrine was introduced in the United States by the case of Sioux City, etc., Ry. Co. v. Stout, 17 Wall. 657, 21 L. Ed. 745, the first of the so-called "turntable cases," and has been extended in other states as well as in Tennessee to many other things. Some of the courts have refused to apply the doctrine to the type of case before us. When the doctrine has been applied it was generally in climbing bridges and poles or some such thing that made the

object attractive to children. It is not sought to apply this doctrine in asserting liability in the instant case. The facts of this case do not warrant the application of the doctrine because there are many elements of the "turntable cases" that are missing here.

■ "The test to be applied is: Was there a likelihood or reasonable probability of human contact with the wires by persons who had a right to be in a place from which such contact was possible? If so, the danger should have been foreseen or anticipated by the defendant." Clumfoot v. St. Clair Tunnel Co., 221 Mich. 113, 190 N. W. 759, 760. In our opinion it was for the jury to say whether an ordinarily prudent person, installing or maintaining such high-voltage wires through trees along a public highway near homes where children lived and near a school or on a road to a school, should not have foreseen or anticipated that children would climb these trees and contact with the wires would probably result. The fact that such an occurrence had not happened before is no sufficient excuse. The plaintiff had no warning by word of mouth or otherwise of the danger that lurked in this tree. The admonition to the plaintiff not to climb trees was general and neither he nor his parents had been warned of the danger that was in this tree. This general admonition "not to climb trees" does not excuse the defendant. The highth of the tree, the wire, the trimming of the tree and insulation of the wire all constitute jury questions.

■ ■ It is very forcefully argued that even though the defendant is guilty of potential negligence that this is not the proximate cause of the accident. It is said the cause of the accident was two deliberate acts on the part of the plaintiff, viz.: climbing the sycamore tree and

deliberately catching hold of the high tension wire. We cannot agree with this argument. The plaintiff had a right to climb the tree—the defendant should have anticipated that this might be done and not have allowed this dangerous wire to be therein. The plaintiff did not deliberately catch hold of the high tension wire—this was done when this boy reached out for more sycamore balls. The plaintiff had no knowledge that his hand was near a high tension wire. It is admitted that this statement of the plaintiff is uncontradicted but it is said we will take judicial knowledge of the fact this statement is untrue. We do not so judicially know. We think the argument on this point is untenable in that when one is shocked by an electric current it does not necessarily burn all parts of the body that are grounded. Where one is burned is a relative matter. The moisture, perspiration, etc., on parts of the body grounded or in contact with the tree in this instance would have some bearing on where the body was burned. In creating this condition, i. e., maintaining this high-voltage wire through this sycamore tree, the defendant should have anticipated a boy might climb this tree and come in contact with the wire. The defendant created the condition or allowed it to exist. As to whether or not this was the proximate cause of the injury is clearly a jury question. There is no intervening act here that should not have been anticipated or foreseen by the defendant. To accept the argument advanced on this question would be to do away with negligence cases entirely.

It is argued by the defendant that the cases of Moyers et al. v. Ogle, 24 Tenn. App. 682, 148 S. W. (2d) 637; Moody v. Gulf Refining Co., 142 Tenn. 280, 218 S. W. 817, 8 A. L. R. 1243, and Stafford v. Consolidated Bus Lines,

179 Tenn. 185, 164 S. W. (2d) 15, are authority for the proposition last above discussed. The facts of these cases are in no wise comparable with the facts of the instant case. The facts being so entirely different none of the cases are controlling here.

█ █ The jury returned a verdict for $10,000 in favor of Carter Leonard Davis and a verdict on behalf of his father for $3,000. The amount of these verdicts is assigned as error because it is said by their size the jury evinced "passion, prejudice or caprice." The trial judge approved these verdicts and rendered judgment thereon. The reasoning, clarity of statement and soundness of a statement and holding on the subject by Mr. Special Justice Trabue, in Reeves·v. Catignani, 157 Tenn. 173, 176, 7 S. W. (2d) 38, deserves repetition here.

"The right to revise even the amount of the verdict by the process of suggesting a remittitur is a delicate one and one that a court should be slow to adopt; and if it should appear that there was in the verdict an element of actual corruption, we think the proper course would be to set it aside. The words 'passion, prejudice or caprice' indicate that the jury was, in the opinion of the court, swayed to a more or less extent by their feelings, which after all are human and are not inconsistent with an honest intention. While, on the other hand, a verdict that is infected with the corruption of one or more of the jurors is to that degree a dishonest verdict.

"The complaint in the case at bar is not that the verdict was corrupt either actually or inferentially, but that it was so large as to indicate that it was influenced by passion, prejudice or caprice; in other words, not that it was a dishonest verdict, but that it was an excessive verdict.

"The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence." 157 Tenn., page 176, 7 S. W. (2d) page 39.

The author of American Jurisprudence in Volume 15 thereof at page 622 has stated the rule as follows:

"Moreover, the question of the excessiveness of a verdict is generally one for the determination of the trial court in the first instance, and its action in granting or refusing to grant a new trial on that ground will not be disturbed on appeal unless an abuse of discretion is shown."

■ Verdicts rendered by juries are in no wise uniform. We have never formulated any mathematical rules of computation in negligence cases upon which we can make these verdicts and judgments uniform. In compensation cases we do have a uniform schedule by statute upon which different types of injuries are uniformly compensated. Liability under compensation statutes is entirely different from liability in a negligence case. We should not use this table as a guide. If the legislature in its wisdom desires to establish such a uniform schedule in negligence cases it is up to them and not the judiciary. It is our duty to take into consideration the nature and extent of the injury, the suffering, expenses, diminution of earning capacity, age, expectancy of life and amount awarded in other similar cases in our decision of this question.

■ Viewing the matter as above indicated we feel that a judgment of $1,500 in the father's case would be correct. Our reason for this conclusion is that this amount fully covers all expenses of the father and allows

him about $750 for loss of his son's services. Judicially we are satisfied that this amount will amply compensate the father for the loss of his son's services.

We feel that the verdict in favor of the son should not be disturbed for the reasons heretofore expressed as well as those hereinafter to be expressed. In our view of the matter there is quite a difference between figuring loss of services and the loss to a boy who has to go through this life in the maimed condition this boy is in. We cannot improve on the following language of Bradley, J., in Beckwith v. City of Malden, 212 Mo. App. 488, 253 S. W. 17, 21, when he said:

"Plaintiff at the time of his injury was eight years old. The evidence shows that he is a bright boy. He learns easily. His life is before him. Whatever he encounters he must meet it conscious of the fact that he has a deformed, crippled hand. Boyhood cannot be to him what it is to the normal boy. At every turn he is handicapped. This much the evidence shows. What man's estate will bring in the way of handicap and mental anguish no one can foresee. We do not believe that we would be justified in holding that the verdict is excessive." 253 S. W., page 21.

We conclude therefore that the verdict in the father's case is excessive and suggest a remittitur of $1,500 and, if accepted, all other assignments of error are overruled and the cases are affirmed at the cost of the defendant; if not accepted, a new trial is ordered.

Hale and McAmis, JJ., concur.