# CITY WATER CO. v. BUTLER.—251 S. W. (2d) 433.

Eastern Section.   November 14, 1951.

Petition for Certiorari denied by Supreme Court, June 7, 1952.

56

Joe F. Wheless, of Chattanooga, for plaintiff in error.

Denman & Massey, of Chattanooga, for defendant in error.

HOWARD, J.  This tort action for personal injuries and property damage grew out of an accident which occurred on Brainerd Road, in the City of Chattanooga, on October 8, 1949, at about 2 A.M., when the motorcycle

owned and operated by the plaintiff, Grady Butler, ran into and struck an excavation made and left near the middle of the street by the defendant, City Water Company, after repairing one of its water mains. It appears that Brainerd Road runs east and west and is a very heavily traveled four-lane thoroughfare. It is a part of the Lee Highway running from Knoxville, Cleveland and other points east to the City of Chattanooga.

Plaintiff was seriously injured in the accident, and his companion, a young girl by the name of Nancy Clark, who was riding with him as a passenger on the buddy seat of his machine, was injured fatally. Plaintiff and his companion, together with four other motorcyclists, three of whom had girl friends riding with them, had previously gathered at the Huddle Inn, a restaurant and beer establishment where the Clark girl worked, and subsequently thereto the caravan visited several other night spots in and around Chattanooga. At the time of the accident the caravan was traveling in an eastwardly direction and was going no place in particular.

The excavation was described as being to the right of the center of the street, about 3 feet long, 2½ feet wide and from 5 to 18 inches in depth. On the east side of the excavation there was a pile of dirt on top of which were several small squares of concrete which had been removed from the surface of the street at the time the excavation was made. This pile of dirt and concrete was described as being from 2 to 2½ feet high. Plaintiff's motorcycle struck the excavation with such terrific force that he and his companion were hurled through the air a distance of 180 feet east of the excavation, and the machine traveled approximately 366 feet therefrom before stopping.

The plaintiff's declaration, which is in three counts, alleges in substance (1) that the defendant negligently

left in the street an excavation and a pile of dirt nearby unguarded and unlighted, and failed to place proper barricades and lights around same; (2) that the defendant violated Ordinance 2329 of the Building Code of the City of Chattanooga which provides that all barriers, materials, rubbish, etc., in the street shall have placed upon or by them lamps with red globes, etc., and (3) that defendant violated Ordinance No. 1394, Sec. 14, Bk. A—1, p. 69 of the Chattanooga City Code requiring red lights be kept burning on obstructions or excavations in streets and thoroughfares.

To the declaration the defendant plead the general issue and filed numerous special pleas as follows: (1) That the defendant was lawfully performing the work in the street; (2) that the excavation was properly barricaded and lighted; (3) that the plaintiff was guilty of contributory negligence by violating Sec. 2682, paragraph (a) of the Code of Tennessee, which provides that a vehicle shall be driven at a careful speed having due regard to traffic, etc., on the road; (4) that plaintiff violated Code, Sec. 2682, paragraph (b), Subsecs. 2 and 3 thereof by traveling in excess of 30 miles per hour through a business and/or a residential section of the City of Chattanooga, and (5) that plaintiff, prior to and at the time of the accident, was operating his motorcycle in violation of Sec. 2695, paragraph (f) of the Code of Tennessee which provides that lights of a vehicle shall reflect sufficiently to observe a person 200 feet ahead, and when there is no on-coming vehicle, a distance of 500 feet ahead.

At the conclusion of all the proof the defendant moved for peremptory instructions, which the Court denied, and the jury returned a verdict for the plaintiff totaling $12,900. On defendant's motion for a new trial the Court ordered a remittitur of $3,675, which was accepted by the

plaintiff, and the motion was duly overruled. Thereupon the defendant perfected this appeal, assigning errors which will hereinafter be considered.

■■ Under proper assignments the defendant contends (1) there was no material evidence to support the verdict; (2) that the court erred in refusing to sustain the defendant's motion for peremptory instructions, and (3) that the plaintiff adduced no evidence of negligence on the part of the defendant. While these questions involve a review of the evidence, such review is only to determine whether there is any substantial evidence to support the verdict. This "requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict." D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S. W. (2d) 897, 901; Johnston v. Cincinnati N. O. & T. P. R. Co., 146 Tenn. 135, 149, 240 S. W. 429; Finchem v. Oman, 18 Tenn. App. 40, 49, 50, 72 S. W. (2d) 564, 570.

Reviewing the plaintiff's proof, two police officers for the City of Chattanooga, West and Lucas, who were working together on the night of the accident, testified that they drove by the excavation several times between 8:00 and 10:30 P.M. West testified that he saw only one light near the excavation, which had a very dim glow and appeared to be setting in the excavation; that "I didn't see it until I was nearly in the place", and that he did not remember if there were any barricades. He stated that Lucas reported the condition to the dispatcher at Police Headquarters.

Officer Lucas stated that he saw only two lights burning, one on the right and the other on the left side of the excavation, and that the light on the left side could hardly be

seen being underneath a bank; that only one light was visible and both lights were very dim. He stated that a board was hanging on two wooden horses on the west side of the excavation with the words "City Water Company" printed on it; that because he thought the excavation was dangerous and inadequately lighted he so reported the matter to the dispatcher at Police Headquarters on two different occasions, once early in the evening by the police radio, and again by telephone just before going off duty at 11 P.M. This officer also stated that the driver of another car had "to lock his brakes" to avoid running into the excavation. Police Dispatcher Morgan, who received the two calls from Lucas, testified that on each occasion he immediately relayed the information to the defendant company, which admits receiving the calls.

Police Officer Kington testified that on the night of the accident he went off duty at 11:00 P.M.; that he lived in the Brainerd area and that on the way home he nearly drove his car into the excavation before seeing it; that he stopped his car, got out and made an investigation. He said there was a barricade, which appeared to be in the shape of a triangle, and several smudge pots around the excavation, only two of which were burning; that one was burning at the east end, and the other on the north side burning very low, just twinkling, and that when he got home he telephoned the Police Dispatcher and reported the matter to him.

L. F. McEwan, bus driver for the Tennessee Coach Company, stated that early in the evening he passed the excavation, which appeared to be poorly lighted; that he was 40 or 50 feet away before seeing the excavation, and that he nearly drove his bus into it. Both Paul Stephens, a motorist, and Mrs. Leota Wall, his passenger, said that they almost ran into the excavation around 8:30

P.M., and that they did not see any barricades or lights around it.

Plaintiff testified that on the night of the accident he was riding in a caravan with four other motorcycles, his machine being second from the front and traveling in the lane near the center of the street; that he was keeping a proper lookout ahead but never saw either a barricade or the twinkle of a light around the excavation, and that when he first saw the excavation he was too close to avoid striking it. He said that his speed was from 30 to 35 miles per hour, and that when his machine exceeded 35 the motor started missing or sputtering like a car out of gas; that the light on his motorcycle was in good mechanical condition, and was on dim, and that neither he nor the girl with him had been drinking. He said that Charlie Hamilton, the rider in front of him who was traveling in the outside lane, safely passed the excavation. Plaintiff stated that he was knocked unconscious by the collision and did not know what had happened for several hours.

Plaintiff introduced a man by the name of Newlon who testified that on the night of the accident, but previous thereto between 5:30 and 7:30 P.M., he accompanied Butler, on Butler's machine, to Harrison and back, a distance of 25 miles from Chattanooga, and he corroborated Butler's testimony that the motor on Butler's machine would sputter out when the speed exceeded 35 or 40 miles per hour.

Plaintiff also introduced three witnesses who were riding in the caravan on the night of the accident. Jarvis Morgan, the motorcyclist immediately following plaintiff's machine, estimated the speed of the machines as 30 or 35 miles per hour, and stated that he saw only one light burning faintly at the excavation, but saw no barricade around it. John E. Johnson, another motorcyclist,

estimated the speed of the machines as 30 miles per hour, and stated that he saw no lights or barricade around the excavation, and Peggy Meers, a girl riding on the machine with Charlie Hamilton, stated that she and Hamilton had just previously passed the Butler machine, and she estimated their speed at from 30 to 35 miles per hour. She also said there were no lights or barricade around the excavation. On cross-examination the plaintiff, as well as the foregoing witnesses, specifically denied that the machines were speeding at the time of the accident, and denied that they knew that County Officer Burns was chasing them.

The defendant introduced several witnesses whose testimony conflicts in many material or circumstantial details with that of the plaintiff's witnesses.

L. H. Templeton, Superintendent of Streets & Sewers of the City of Chattanooga, said that on the night of the accident, but previous thereto, he was returning to his home around 10 o'clock; that he passed the excavation which was barricaded, and that the lights around it were burning and could be seen for a distance of 2 blocks.

Stanley Prystup, an employee of the defendant who received the telephone calls from the Police Dispatcher, stated that upon receipt of the first call he immediately made an investigation of the conditions around the excavation, and that before leaving there he placed 4 lighted smudge pots around it; that upon receipt of the second telephone call around 10 o'clock he again went out and made an investigation of the conditions and found all 4 smudge pots which he had previously lighted burning. He said there was also a barricade on the east side of the excavation about three feet above the street, but that no warning lights were placed or hanging thereon.

M. O. Burns, a County Officer, testified that his attention was attracted to the motorcycles while he and his associate were traveling westwardly on Brainerd Road; that they met the caravan at or near the intersection of Brainerd Road and Belvoir Avenue where he turned the car around and followed them. He stated that the motorcycles were traveling at a pretty high rate of speed and that he followed them about three quarters of a mile or a little further. He didn't say exactly how fast the motorcycles were going, but stated that the speedometer on his car showed he was traveling from 65 to 70 miles per hour and that he didn't gain any on them. He said that he had passed the excavation just previous to the accident and noticed that the lights were burning; that it was "lighted up well enough, I thought". He stated that he remembered seeing two lights burning, one on the pile of dirt and the other on the side of the excavation, and that these lights could be seen for a block or more.

E. E. Williams, Captain, Police Department, City of Chattanooga, who was on duty in the Brainerd area on the night of the accident and who received the report by police radio, stated that he arrived on the scene within two or three minutes after the accident occurred and saw that the obstruction had been hit; that he immediately went to the two injured persons who were lying in the street and that he directed that no one touch the barricade or anything until the police photographer arrived. He said there were several pieces of concrete scattered over the street, and that he nearly hit one of them as he drove around the excavation, which could be seen for a distance of only 50 or 60 feet; that he saw 4 smudge pots around the excavation, only two of which were burning, one very good and the other dim; that the two burning were located on the southeast and southwest corners of the excavation

near the middle of the two right lanes of the street. Regarding the two unlighted smudge pots, Captain Williams located one of them near the middle of the street and the other on top of the pile of dirt, turned upside down. He stated that at the time of the accident he did not know that Officer Lucas had previously notified Police Headquarters that the excavation was dangerous.

Defendant introduced John Steinmann, bus driver for the Southern Coach Lines in Chattanooga, who at 12:30 A.M. on the night of the accident was returning to the city with several passengers picked up at the end of the bus line in Brainerd. This witness stated that he was traveling in a westwardly direction on Brainerd Road and passed the excavation on his left; that around the excavation he saw at least 3 lights clearly visible for a distance of three blocks either way, as the street in this area was straight for a considerable distance. This witness also stated that the pile of dirt and barricade were plainly visible and could be seen for quite some distance.

As will be observed, we have reviewed at length the testimony of all the witnesses introduced by both plaintiff and defendant, and under all the evidence, there being numerous conflicts, it was the duty of the jury to reconcile these conflicts, and the jury having adopted the plaintiff's theory of the case, we think there was ample material evidence to support the verdict. The plaintiff having introduced numerous witnesses who testified that the excavation could not be seen with the aid of automobile headlights until the driver was within very close proximity of it, the question of whether or not the defendant was negligent in failing to adequately light and barricade the excavation was also for the jury. Under our decisions, questions of negligence are for the jury. Lincoln Amusement Co. v. Williams, 24 Tenn. App. 692,

149 S. W. (2d) 86; Louisville & N. R. Co. v. Cantrell, 25 Tenn. App. 529, 160 S. W. (2d) 444; Osborn v. Nashville, 182 Tenn. 197, 185 S. W. (2d) 510.

It is next contended that the Court erred in refusing to direct a verdict because the evidence showed "that the defendant did not have any actual or constructive notice of any improper lights or improper conditions before the accident occurred". This assignment is without merit for the reason that the proof shows that defendant, previous to the accident, received at least two telephone calls from Police Headquarters regarding the dangerous condition of the excavation. There was also proof by witnesses that the excavation could not be seen by the driver of an approaching car more than 50 to 60 feet away. Under the proof, we think that a jury question was presented as to whether or not the defendant had sufficient notice either actual or constructive. Smith v. Sloan, 189 Tenn. 368, 225 S. W. (2d) 539, 227 S. W. (2d) 2; 25 Am. Jur. Sec. 589, p. 876; 40 C. J. S., Highways, Section 281, pp. 338, 339.

It is also contended that the proof showed that the direct and proximate cause of the accident was due solely to the negligence of the plaintiff, because of the excessive high rate of speed of his motorcycle, in violation of Sec. 2682, paragraph (b), Subsecs. 2 and 3 of the Code of Tennessee, which provides that the driver of a motor vehicle traveling in excess of 30 miles per hour through a business and/or residential section shall be prima facie guilty of reckless driving. While there was a sharp conflict in the evidence as to plaintiff's rate of speed, three witnesses besides plaintiff testified that at the time of the accident the motorcycles were traveling at from 30 to 35 miles per hour. Where there is a conflict in the proof, the question of contributory negligence is

for the jury. Patillo v. Gambill, 22 Tenn. App. 485, 124 S. W. (2d) 272; McBroom v. S. E. Greyhound Lines, 29 Tenn. App. 13, 193 S. W. (2d) 92; Ezell v. Post Sign Co., 30 Tenn. App. 256, 205 S. W. (2d) 13; Schindler v. Southern Coach Lines, 188 Tenn. 169, 217 S. W. (2d) 775. Likewise, questions of ordinary care and proximate cause are for the jury. Southeastern Greyhound Lines v. Groves, 175 Tenn. 584, 136 S. W. (2d) 512, 127 A. L. R. 1378; Campbell v. Campbell, 29 Tenn. App. 651, 199 S. W. (2d) 931; Fields v. Gordon, 30 Tenn. App. 110, 203 S. W. (2d) 934.

Next it is contended that the plaintiff was guilty of negligence per se because the headlight on his motorcycle, when dimmed, would not reflect an object 200 feet ahead as required by Sec. 2695, paragraph (f) of the Code of Tennessee. This assignment has given us much concern since the defendant admitted that the light on his machine reflected only 35 to 40 feet ahead. Defendant relies upon the rule stated by our Supreme Court in West Construction Company v. White, 130 Tenn. 520, 172 S. W. 301. While the law stated in that case has with few exceptions been followed in subsequent decisions, we think it differs from the instant case in many respects. In the West Construction Company case the obstruction (mixer) was described as being from 4 to 6 feet wide, 12 feet long and 9 feet high, and was an object which could be seen by the driver of an approaching automobile several feet away. In the instant case the defect was an excavation in the street with a pile of dirt from 2 to 2½ feet high on the east side, and according to plaintiff's witnesses, could not be seen by drivers of motor vehicles with good lights for more than 40 or 50 feet. Besides, in the West Construction Company case the driver of the automobile had driven over the street previous to the

accident, while in the present case there was no evidence that the plaintiff had ridden over the street or had any previous knowledge of the excavation.

Even though the light on plaintiff's motorcycle did not conform to the statutory requirements, the question of whether or not this was the proximate cause of the accident and constituted such contributory negligence as would preclude recovery was a question for the jury under proper instructions of the Court. No doubt this matter was strenuously argued to the jury, and the record discloses that the Court gave a very lengthy charge on this question. In declaring that it was a jury question as to whether or not the proximate cause of the death of a pedestrian who was killed while violating a statute by walking on the wrong side of the highway, Chief Justice Neil, speaking for our Supreme Court, in Standridge v. Godsey, 189 Tenn. 522, 523, 226 S. W. (2d) 277, 281 said:

"If we should concede that the deceased was violating the law of the road, which is negligence per se, there remains the question of whether or not his fault was the proximate cause of the accident. By the weight of authority the contributory negligence of the plaintiff in violating the law of the road, or municipal ordinances regulating traffic, is not a complete defense unless it contributes to the accident as the proximate cause. Whether or not his fault was the proximate cause of the accident was for the jury. Vol. 1, p. 117, Foundations of Legal Liability (Street); Catron v. Birchfield, 159 Va. 60, 165 S. E. 499; Corcoran v. Pac[ific] Auto States [Stages] 116 Cal. App. 35, 2 P. (2d) 225." See also, Sutherland v. Keene, 29 Tenn. App. 303, 203 S. W. (2d) 917. Complaint is made that the jury verdict as reduced

by the trial court is so excessive as to indicate passion, prejudice and unaccountable caprice on the part of the jury. As previously pointed out, the Court on defendant's motion for a new trial ordered a remittitur of $3,625, which was accepted by the plaintiff. If the verdict as originally rendered by the jury was excessive, we think that the error was fully cured by the remittitur ordered by the trial judge, and his judgment is entitled to great weight in this Court. According to the medical proof, plaintiff suffered a severe concussion of the brain, the X-ray showing a fracture of the right frontal bone, and a spinal puncture showed blood in the spinal fluid. Plaintiff had no paralysis, but Dr. McCravey, specialist in neurology, said his limbs were uncontrollable from a conscious reaction and that he required constant attention to keep him in bed. For several days plaintiff had to be fed intravenously and through a stomach tube, and for a period of 10 days or two weeks he was mentally confused. Upon his arrival at the hospital Dr. McCravey described his chances of recovery as very doubtful. Plaintiff remained at the hospital for about two weeks and was away from his work about two months, during which time he lost in earnings $100 per week. Plaintiff testified at the trial that he was still nervous and suffering from severe headaches, and Dr. McCravey stated that "any disability he has now might, from a practical sense be considered to be permanent." Plaintiff's doctor bills amounted to $326 and his hospital bill $500, making a total of $826.

■■ While no mathematical rules of computation have ever been formulated making verdicts and judgments uniform in negligence cases, it is the duty of the courts to take into consideration the nature and extent of the injuries, the suffering, expenses, diminution of

earning capacity, inflation and high cost of living, age, expectancy of life and amount awarded in other similar cases. Town of Clinton v. Davis, 27 Tenn. App. 29, 177 S. W. (2d) 848; Foster & Creighton Co. v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222; 15 Am. Jur. Sec. 205, pp. 621, 622.

In Town of Clinton v. Davis, supra [27 Tenn. App. 29, 177 S. W. (2d) 853], Judge Burnett, speaking for the Eastern Section of this Court, said:

" 'The complaint in the case at bar is not that the verdict was corrupt either actually or inferentially, but that it was so large as to indicate that it was influenced by passion, prejudice or caprice; in other words, not that it was a dishonest verdict, but that it was an excessive verdict.

" 'The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence.' [Reeves v. Catignani] 157 Tenn. [173, at] page 176, 7 S. W. (2d) [38, at] page 39."

██ ██ Finally, it is urged that the Court erred in permitting plaintiff's attorney to interrogate the jurors on their voir dire as to whether any of them owned stock in or were employed by any Insurance Company. We are unable to consider this assignment for two reasons; (1) because the defendant made no objections to the questions asked the jurors, and (2) there is no claim that such questions were not asked in good faith to ascertain the juror's qualifications. In such case such questions are proper. Vanderbilt University v. Henderson, 23 Tenn App. 135, 127 S. W. (2d) 284; Paducah T. &. A. Railroad v. Muzzell, 95 Tenn. 200, 31 S. W. 999; 50 C. J. S., Juries, Sec. 275, pp. 1046-1047; Luchessi v. Barnard, 7

Tenn. App. 353; 56 A. L. R. 1454; 74 A. L. R. 860; 95 A. L. R. 404; 105 A. L. R. 1330.

Accordingly, all assignments of error will be overruled and the judgment below will be affirmed at defendant's costs.

McAmis and Hale, JJ., concur.