FINCHEM v. OMAN.—72 S. W. (2d) 564.

Middle Section.   April 7, 1934.

Petition for Certiorari denied by Supreme Court, June 23, 1934.

Higgins & Moore, of Nashville, for plaintiff in error.

Manier & Crouch and Andrew Ewing, all of Nashville, for defendant in error.

FAW, P. J. Jesse Finchem suffered serious, painful, and permanent personal injuries as the result of the overturning of his automobile on the night of Saturday, October 18, 1930, at a point on state highway No. 15 in Franklin county, Tenn., and his automobile was practically demolished in the same casualty.

Thereafter he sued John Oman, Jr., in the circuit court of Davidson county for $25,500 as damages, averring that the proximate cause of the aforesaid injuries to his person and his automobile was negligence of defendant Oman in the particulars stated in plaintiff's declaration, and the case was thereafter taken up for trial before a jury upon the issues made by the defendant's plea of not guilty to the plaintiff's declaration, and the trial proceeded to the conclusion of all the proof, when the trial court, on motion of the defendant, directed the jury to return a verdict for the defendant, which was done, and the plaintiff's suit was dismissed at his cost. Thereupon, the plaintiff, after his motion for a new trial had been overruled,

appealed in error to this court, and is here insisting through assignments of error and supporting brief and argument, that the learned trial judge erred in peremptorily directing a verdict for the defendant. No other error is assigned.

It is averred in plaintiff's declaration that in the month of October, 1930, defendant was engaged, by public contract (a contract with the state department of highways and public works), in grading and draining a certain highway in Franklin county, known as highway No. 15, leading from Winchester in Franklin county to Fayetteville in Lincoln county, and at certain points the construction of highway No. 15 was along and on the "old Winchester and Belvidere public road known at the time as State Highway No. 97," and on or about October 18, 1930, the defendant was so engaged, through servants, and during the day of the 18th they had been engaged in raising the grade of a portion of the old Belvidere highway by bringing from other points loose dirt, conveyed by machinery, and pouring it in and upon the old roadbed, raising the road some 2 or 3 feet; that defendant was building the grade toward Winchester from the direction of Huntland, over the old roadbed to the height aforesaid as progress was made; that defendant's servants and agents worked as aforesaid on the day of the 18th, and at the point where they quit work in the evening they left an embankment of loose dirt across the said public road to a height of some 2 or 3 feet; that this embankment was not an abrupt or perpendicular bank, but was a gradual slope from the old roadbed back several feet to the height of the new proposed roadbed and the grade being constructed; that this new fill was fresh loose dirt, and the defendant quit work in the evening of October 18th, and the road was thus negligently left in the darkness of that night.

The above-stated averments of the declaration are supported by undisputed proof, except that there is persuasive evidence in the record that the vertical height of the "embankment" (usually referred to by the witnesses as the "fill") was not more than 15 to 18 inches. However, the testimony of plaintiff and at least three witnesses in his behalf is to the effect that the vertical height of the fill was 3 feet or more.

It also appears that the fill was not entirely "across the public road," but was considerably more than half way across same.

Plaintiff further avers in his declaration that, while he was driving his automobile along said old road in the direction of Huntland, and from the direction of Winchester, in a reasonably cautious, prudent, and careful manner, in the nighttime of October 18, 1930, he approached the aforesaid embankment and, without any fault on his part, ran into and upon said loose dirt, and as a result his car was turned over and demolished and plaintiff was thereby injured (which injuries are described in the declaration); that his car was then and

there equipped with lights and brakes as the law requires and prudence would dictate; that the dirt making said fill tapered, at an angle and slant, from the old roadbed on which plaintiff was driving gradually to the top of the fill, a distance of several feet, and was thus left by defendant so that it did not appear, neither was it likely to appear, to plaintiff to be a place of danger, as it was; that defendant left these conditions in the darkness of the night without a sign or lights or warning to attract the attention of those who might be using the road, and did not leave "any watchman or guard in charge of the work at said time and place, in which particulars and regards defendant was grossly and recklessly negligent."

Although the record is of considerable size (about 500 pages), we find that the case, as it comes to this court, is within a narrow compass.

The motion on behalf of defendant below for peremptory instructions was specifically based upon two grounds, viz.: (1) "That there is no evidence of any negligence on the part of defendant creating any liability on defendant;" and (2) "that the undisputed evidence shows that the plaintiff was guilty of such contributory negligence as bars his recovery."

The trial court sustained the above motion for peremptory instructions on the second of the two grounds thereof, as appears from his statement to the jury, which was as follows:

"The Court: Gentlemen of the jury, counsel for the defendant has moved the Court to instruct the jury to return a verdict in favor of the defendant on two grounds; one is that there is no evidence of negligence on the part of the defendant, and the other is that there is evidence of negligence on the part of the plaintiff. Now, on this second ground, I am directing the jury to find a verdict in favor of the defendant, and it is your duty to do so. But I think you are entitled to understand the reason for it. Under the law in this State and in every other state that I know anything about, a man driving an automobile must be constantly on the lookout ahead, and to see the things that can be seen by the exercise of ordinary care; and this young man said he had good headlights and he didn't see this fill and didn't see this turn-out in the part of the old road that was wide enough for him to go around to the left, and he didn't see this red clay rise until after he got up on it. Now, gentlemen, that won't do. The law is, you must see everything that is within reach of your headlights—and he said he had good headlights, driving out, revealing the entire road. It is just a case of contributory negligence on his part; and where the plaintiff is guilty of negligence that contributes to it in any degree, proximately, he cannot recover anything.

"So I am directing the jury to return a verdict in favor of the defendant. So say you all? (Affirmation by the jury.)"

In this court the defendant is insisting that his motion for a directed

verdict should have been sustained for both of the reasons stated in the motion.

It is, to say the least, doubtful whether defendant is in a position to rely on the first ground of his motion for peremptory instructions, for the trial judge stated, before directing the verdict, that, if there was nothing in the motion except the question of negligence on the part of defendant, the case would have to go to the jury. The defendant did not except to the court's ruling adverse to him on the first ground of his motion, and he neither moved for a new trial nor appealed.

██ ██ But assuming that the question, as to whether there was or not evidence of the alleged negligence on the part of defendant to take the case to the jury, is open for decision in this court, we are satisfied that the trial judge did not err in overruling that ground of the motion.

The embankment or fill on and across a portion of the highway at the point in question was not a nuisance, as alleged in the first count of plaintiff's declaration, for defendant had a lawful right to erect the fill in the process of the construction or reconstruction of the highway, under his contract with the state highway department; but reasonable men could not differ about the fact that the fill disclosed by the proof constituted an obstruction to the customary use of the highway. The defendant, therefore, owed to travelers on the highway the duty of using proper precautionary means to warn them of the presence of the obstruction. The proof was conflicting with respect to the degree of the danger to be reasonably anticipated from the presence of the fill in the highway, and also as to whether defendant did or did not display a ''red light'' on the fill as a warning signal.

██ It is true, as argued for defendant, that the state department of highways, through its officers and representatives, and not the defendant, determined the location and height of the fill, and that there is no evidence that defendant constructed it in a negligent manner, or otherwise than according to the plans and specifications prescribed by the highway department; but this did not relieve defendant of the duty to adopt reasonable safeguards to protect the traveling public from injury which might be reasonably apprehended from the presence of the obstruction thus created in the highway. The undisputed proof shows that no effort was made to prevent the free use of the highway by the traveling public during the progress of the work in question, and that such use, both by day and by night, was continued without interruption. We think it apparent that the learned trial judge rested his ruling, that plaintiff was guilty of contributory negligence which barred his action, upon the principle announced in the case of West Construction Co. v. White, 130 Tenn., 520, 172 S. W., 301, and subsequent cases in accord there-

with, as those cases have been very generally interpreted and understood by the bench and bar, which rule was that, where a person drives an automobile at night in a dark place so fast that he cannot stop and avoid an obstruction within the distance lighted by the lamps of his car, he is guilty of contributory negligence which will bar his recovery.

The rule of the West Construction Company Case, as that rule is stated above, has been frequently followed and applied in subsequent cases, among which are the following: Knoxville Railway & Light Co. v. Vangilder, 132 Tenn., 487, 178 S. W., 1117, L. R. A., 1916A, 1111; Tennessee Central Railway Co. v. Schutt, 2 Tenn. App., 514; Cleveland Transfer Co. v. Clark, 6 Tenn. App., 364.

In West Construction Co. v. White, supra, the record afforded no explanation of the collision, other than the fact that the speed of the automobile was so great that it was impossible for the driver to stop it after the obstruction (a large concrete mixer) was disclosed by the lights of his car.

In three reported cases wherein the defendant sought to invoke the rule of the West Construction Company Case, but in which there was evidence of conditions and circumstances from which it could be reasonably inferred that the automobile driver might not see the obstruction, although it was in front of his car and within the distance to which the range of his lights would ordinarily reach, this court ruled that it could not be held, as a matter of law, that the plaintiff was guilty of contributory negligence which would bar his action. These cases are Patterson v. Kirkpatrick, 11 Tenn. App., 162; Huntsman Brothers, Inc., v. Baking Co., 12 Tenn. App., 535; and Westmoreland Heights v. Martin, 13 Tenn. App., 142, 149.

On October 21, 1933 (which was since the appeal of the instant case), the Supreme Court handed down an opinion in the case of Main Street Transfer & Storage Co. v. Smith, 166 Tenn., 482, 63 S. W. (2d), 665, 668, in which it was held that "exceptional circumstances" may make "the applicability of the general rule a question of fact for the jury rather than a question of law for the court." In that opinion, after reviewing the cases we have cited (except Westmoreland Heights v. Martin, supra), and stating that "the rigor of the rule was relaxed, or its application denied, by the Court of Appeals" in the two cases of Patterson v. Kirkpatrick and Huntsman Brothers, Inc., v. Baking Co., supra, the Supreme Court said:

"The rule formulated and applied in West Const. Co. v. White, was no more than an application to given facts of the familiar rule that the test of negligence is whether the action under scrutiny was in accord with the actions of reasonably prudent men under the same or similar circumstances. This was recognized by the able opinions of the Court of Appeals in the two cases last cited, in which it was ruled that exceptional circumstances made the applicability of the

general rule a question of fact for the jury rather than a question of law for the court.

"The accident in which petitioners were injured occurred on a state highway, between two populous communities. This highway, as well as others of like character, was built to accommodate vehicles traveling at a high rate of speed. Speed as a factor of negligence in the operation of an automobile has been rendered of minor importance by common experience and by the removal of an arbitrary miles per hour limit from the statutes. These conditions have relatively increased the degree of negligence and danger involved in the parking of stationary vehicles or other obstructions on the paved surface of a highway. Travelers have become more confident of a free and unobstructed passage ahead on the highways. In these circumstances, we cannot now say with confidence, as a matter of law, that a person of ordinary prudence and caution would have reduced his speed below the rate of 25 miles an hour on approaching the crest of a grade, under the conditions in which petitioners were placed, because the surface of the pavement could not be seen beyond the crest. They had the legal right to expect that an obstruction just beyond the crest would be evidenced by a warning light, and whether they were proceeding negligently was at least a question of fact for the jury.

"Adhering to the general rule that it may be negligence in law to operate an automobile through darkness at a rate of speed which will not permit the avoidance of an obstruction disclosed by the rays of the lights with which the automobile is equipped, we are of opinion, and so rule, that exceptional circumstances will render the rule inapplicable, as contrary to the practice and experience of persons of ordinary caution and prudence. The emergencies and hazards of present-day travel by automobile are many and varied, and we think no arbitrary or universal definition of the circumstances which will render the rule inapplicable is possible. The facts and circumstances of the cases in which the rule is invoked, weighed in the light of observation and experience, must control and direct the ruling of the court in each particular case, as in other negligence cases."

In view of the opinion from which we have just quoted, it is necessary that we ascertain whether or not there was any material evidence admitted below which reasonably tended to show any "exceptional circumstances" that rendered the "general rule" inapplicable, and required the submission of the case to the jury.

At the time plaintiff suffered the injuries for which he is suing in this case, he was 19 years of age. His father's home was in Franklin county, and plaintiff had, in times past, been familiar with the road on which he was driving when injured, but he had been employed by the state highway department as a truck driver for about a year and a half or two years, and had not been over the road on

which he was injured for about four months, and did not know that the work of reconstruction was in progress on that road.

According to plaintiff's testimony, corroborated by the records of the state highway department, plaintiff worked ten hours on a highway near Monteagle in Grundy county on Saturday, October 18, 1930. Plaintiff testified that he quit work that afternoon about 5 o'clock and then drove to Winchester, where, about 8:30 o'clock that evening, he met his friend Sam Stovall, a young man about 27 years of age at that time, who was also an employee of the state highway department.

Later in the same evening, between 9 and 10 o'clock, plaintiff and Sam Stovall left Winchester in plaintiff's Ford roadster, driven by plaintiff, and in that manner proceeded along and over the highway mentioned in the declaration for a distance of about 8 miles, to the point (about 2 or 3 miles southwest of Belvidere) where plaintiff's car ran upon the fill and was overturned, as before stated. Their intended destination was the home of Sam Stovall's father, near Salem, a few miles further southwest of Winchester.

Plaintiff testified that, while he was "driving down the road" at a speed of 25 miles an hour, his car struck the fill and ran upon it for a distance of about 20 feet, and there turned over on its left side, pinning his left arm under it in such manner that he could not release himself, or be released, until the car was turned back on its wheels; that the injuries for which he is suing resulted from the overturning of the car at the time and in the manner stated, and that the car overturned because he lost control of it as the result of unexpectedly striking the embankment and running upon the loose dirt.

Plaintiff testified further that the headlights and brakes on his car were in good condition; that he could have stopped his car within a distance of 30 feet while moving at a speed of 25 miles an hour; that he did not exceed a speed of 30 miles an hour at any time on the journey from Winchester to the place where he struck the fill; that he had looked at his speedometer about a hundred yards from the fill and it showed 25 miles an hour, and that he did not increase his speed from that point to the fill; that the fill was "almost across the road"; that he saw, after the accident, that the fill was about two and one-half feet high and "almost across the road," but was "kind of angling, a little bit," and not straight across, and the end of the embankment was not abrupt, but sloped downward from the top, in the direction from which he was approaching, to the old roadbed; that when his car "struck the fill it kind of turned the front end around" and it went about 20 feet out on the fill and turned over; that the road was straight and comparatively level for a long distance before and until he reached the fill, and there was nothing in the road to obstruct his view ahead; that the headlights

of his car were properly focused and "burning good," and they lighted the road ahead for several hundred feet; that the fill was made of "red dirt" and the old roadbed on which he was traveling had been covered with "creek gravel," and, both being red, there was no difference in the color of the fill and the old roadbed that attracted his attention; that it "appeared all alike" to him, and he did not see the fill, or know it was there, until he "got on top of it." Plaintiff further testified that there were no barricades of any kind, nor any watchman, to keep persons traveling on the highway off of the fill, and no red lights or warning signs of any kind on or about the fill, and that he did not see any notices of any kind on the road between Winchester and the fill indicating that there was construction or reconstruction work in progress, or danger of any kind, on the road ahead of him.

Plaintiff's witness, Sam Stovall, was riding on the seat beside plaintiff in plaintiff's Ford roadster at the time plaintiff was injured. He fully corroborates the testimony of plaintiff which we have already narrated herein, and to state Stovall's testimony would be, in substance, to repeat our statement of plaintiff's testimony with reference to the rate of speed of the car, the absence of barricades, red lights, watchmen or warning signs of any kind, and the inability of the occupants of plaintiff's car to see the fill as they approached it.

However, we will add that Sam Stovall stated that the fill was about 3 feet high; that it was "slanting" just like dirt "would slide off" when poured out, and that it was "angling and slanting across the road;" that he did not see the fill before they "hit it," and that "it all looked just alike." He was asked, "What kind of a road was it?" and he replied: "Well, it was supposed to be a gravel road and it was rough and they had built this fill in here and the grader had been run over it and the dirt scattered along there so it looked just alike." Stovall stated further that it had been a gravel road but it was about worn out and was "showing the red dirt."

Sam Stovall not only saw the fill and surrounding conditions immediately after the car overturned on Saturday night, but he went back to the scene on the next morning (Sunday) and observed the conditions there.

Plaintiff's witness J. C. Garrett, who lived very near the place of the accident, was asked, on cross-examination, if there was anything to keep the driver of a car going toward Fayetteville (the direction in which plaintiff was going) from seeing that fill, and he replied: "He couldn't tell there was a fill in the road until he got right to it at night."

And Garrett further stated that the "old road" at the place in question was "a kind of muddy looking color"—"country mud, out of a road." He was asked "to state if the color of the old road was

similar to the new road that was filled up," and he replied: "You couldn't tell any difference to amount to anything."

Plaintiff's witness H. W. Chasteen was in the transfer and trucking business at Decherd. He went to the scene of the accident to remove plaintiff's wrecked car on Sunday morning following the accident on Saturday night. We qnote from Chasteen's redirect testimony as follows:

"Q. 1. Mr. Chasteen, I will ask you if headlights working correctly would show up this dump in that road as it would show up an automobile or a log or a fence across the road? A. No, sir, it will not.

"Q. 2. What was the color of that dirt that made that fill? A. It was clay dump there. It was dark a little where they went up and down it.

"Q. 3. Could you see that dump better in the daytime driving towards it or could you see it better at night? A. You could see it better in daytime.

"Q. 4. Mr. Chasteen, state whether or not the road along there, the old road and the new dirt that was put in there, were the same color or of a different color? A. No, there was no great difference. This red dirt had been poured out there and people were passing over it and there was very little or no difference between the color of the road and the fresh dirt in the dump."

There was no attack upon the general character of plaintiff and his witnesses for truth and veracity, and there was testimony that the general character of plaintiff for truth and veracity is good.

■ ■ The defendant introduced witnesses whose testimony directly contradicts plaintiff and that of his witnesses on substantially all of the material and determinative matters of fact covered by the evidence on behalf of plaintiff which we have stated; but these conflicts of testimony merely presented issues for determination by the jury, and it would serve no useful purpose to extend this opinion by stating the disputed testimony on behalf of defendant. The function of this court in jury cases is not to make findings of fact, but merely to ascertain whether there was evidence which required the submission of the issues to the jury, or, if a verdict was rendered by the jury, then to ascertain whether there was material evidence to support the verdict. An assignment of error in this court that the trial judge sustained a motion for a directed verdict presents a question of law, and not a question of fact. Section 12 of chapter 100 of the Public Acts of 1925 (Code, section 10621), requiring the Court of Appeals to file written findings of fact, has no application to a case tried by a jury, either in a law or a chancery court. De Kalb County v. Tennessee Electric Power Co. (Tenn. App.), 67 S. W. (2d), 555, 560; Anderson v. Stribling, 15 Tenn. App., 267.

■ It is a well-settled rule, arising out of the constitutional right

of trial by jury, that, in disposing of a motion for a directed verdict, the trial judge must take the most favorable view of the evidence supporting the rights asserted by the party against whom the motion is made, and disregard all countervailing evidence. Wildman Mfg. Co. v. Davenport, 147 Tenn., 551, 556, 249 S. W., 984; Elmore v. Thompson, 14 Tenn. App., 78, 81.

█ The credibility of the witnesses is peculiarly a matter for the jury to determine, and if the witnesses have given substantial testimony bearing on the issues, to which the jury might, in the proper exercise of its functions, give credit, it is error for the court to direct a verdict in opposition to such testimony on the ground that the witnesses are unworthy of belief. Anderson v. Stribling, supra, page 279 of 15 Tenn. App., and other cases there cited.

It is argued for defendant that the plaintiff must be held to have seen what he ought to have seen, and that evidence which contradicts "physical facts and mathematical laws" cannot be accepted (citing Klein v. I. C. Railroad Co., 4 Tenn. App., 563; Louisville & N. Railroad Co. v. May, 5 Tenn. App., 100; and Nashville, C. & St. L. Railway Co. v. Justice, 5 Tenn. Civ. App. [5 Higgins], 69). The rules which defendant thus seeks to invoke are sound, but we are of the opinion that they are not applicable to the case now before us. The testimony of plaintiff and his witnesses that we have pointed out is to the effect that, although the fill was well within the range of the headlights of plaintiff's car and he was on the "lookout ahead," he could not discover the presence of the fill in the highway because of its harmony and correspondence in color with the roadbed upon which plaintiff was approaching it, coupled with the manner in which it "sloped" toward plaintiff. We are unable to see wherein this testimony necessarily contradicts physical laws, and its truth or falsity was a matter for the jury to determine upon a consideration of all the evidence.

It results that the plaintiff's assignment that it was error for the trial court to sustain the defendant's motion for a directed verdict and to dismiss plaintiff's action is sustained, the judgment of the circuit court is reversed, and the cause will be remanded to the circuit court of Davidson county for a new trial.

The costs of the appeal will be adjudged against the defendant John Oman, Jr. The costs accrued in the trial court will await the future judgment of that court.

Crownover and DeWitt, JJ., concur.