## TRIGG v. H. K. FERGUSON CO. et al.
### —209 S. W. (2d) 525.

Western Section. May 30, 1947.

Petition for Certiorari denied by Supreme Court, January 16, 1948.

674

James D. Senter, of Humboldt, and Canale, Glankler, Loch & Little, of Memphis, for plaintiff in error.

W. Wright Mitchell, of Memphis, and Currie Drake, of Milan, for defendant in error.

ANDERSON, P. J. The plaintiff-in-error, who was the plaintiff below, brought this suit to recover damages for personal injuries sustained by him when his car skidded, went over an embankment and struck a nearby pole carrying a power line. The scene of the accident was within the area in which there was being constructed for the United States Government a war plant known as the Wolf Creek Ordnance Plant, located near Milan, Tennessee. The defendants were H. K. Ferguson Company, a corporation, and the Oman Construction Company, a partnership, who were the general contractors engaged by the Government to build the plant. At the conclusion of the plaintiff's evidence, the judge directed a verdict for the defendants and the plaintiff appealed in error.

The accident occurred at the intersection of what are known as Routes 54 and 23. Route 54 runs east and west, and Route 23 north and south. Route 54 does not cross

Route 23 and as a result there is formed what is known as a "dead-end" intersection. In other words, Route 23 runs across the end of Route 54, the two routes forming a "T", with Route 23 representing the top, and located on a fill or embankment about 4 or 5 feet in height. The injuries were sustained when the plaintiff's car skidded as he tried to make the right angle turn from Route 54 into Route 23, and went off the embankment, striking the power pole.

The declaration charged negligence in the following respects: (1) in failing "to construct and maintain warning signs or signals on the approach to the 'dead-end' and intersection of Route 54 with Route 23"; (2) in failing "to erect a guard rail on the edge of the embankment on the east side of Route 23 at this point"; (3) in "erecting and maintaining a power pole in such close proximity to the edge of the road at this point as to constitute a hazard".

Summarized, the defendant's contentions in support of the directed verdict are (1) that there was no evidence of actionable negligence on their part; (2) that the plaintiff was shown indisputably to have been guilty of proximate contributory negligence; (3) that they are entitled to share the immunity of the United States Government; (4) that the intersection was constructed in exact accordance with the plans and specifications approved by the government authorities which call for no warning signs or barriers; (5) that at the time of the accident the roads forming the intersection had been completed by the defendants and accepted by the government and hence the responsibility for signs and barriers was that of the government alone.

The contract between the government and the defendants was entered into on December 31, 1940. It called for the construction of a complete plant for the loading of ammunition for certain kinds of shells. Work was begun in February, 1941, and the job was completed March 31, 1942. The accident occurred in October, 1941, at which time the work was at its peak.

The project was a part of the preparedness program undertaken in anticipation of our participation in the late world war. It can be truly said to have been a tremendous enterprise—one of those vast undertakings which are characteristic of the genius of American industry. The estimated cost was $8,162,055.00. The area covered was about 40 square miles. Upon completion of the contract it contained 217 miles of paved road, to say nothing of steam railroads and the like. When the work was fully under way, the defendants' employees numbered 12,000 and those of their subcontractors, 5,500 to 6,000. Representatives of different branches of the Army appear to have been present throughout the construction, and the Proctor & Gamble Defense Corporation who, upon its completion, was to and did operate the plant for the government, maintained a skeleton organization on the site.

For obvious reasons the area was closely guarded and could be entered only through several gates, one of which was known as the Milan Gate. Only those with passes or badges were admitted. At each gate was a large sign, notifying those who entered what was to be expected on the inside. The language was something to the effect, "Under Construction—Danger—Travel at Your Own Risk". Due to a housing shortage, there were dormitories inside the construction area, in which some of those

identified with the work in one way or another lived. Sixty per cent of those occupying the dormitories were employees of the defendants. Among these was the plaintiff, an office employee, who worked in the administration building.

On October 16, 1941, after completing his work for the day, plaintiff went to his quarters in the dormitory and later left the area on a social engagement. In doing so, he traveled a road known as Route 104, which led to what was known as the Milan Gate. After his departure, and before his return, the defendants' employees cut a ditch across Route 104 at a point between the Milan Gate and his living quarters. Having done this, they placed a barricade and detour sign at the point, indicating the route to be taken in place of the one that was closed.

Plaintiff returned to the area about midnight, and when he reached the detour sign, he followed the route indicated which led into a section of the project with which he was unfamiliar. He traveled south until he reached the route known as 54. At this point he turned east, traveling on Route 54 until he reached the scene of the accident. Both Route 54 and Route 23 were what is known as "black top" asphalt roads. On Route 54 for about 600 yards west of the intersection there was a steep downhill grade. The night on which the accident occurred was dark and there was a drizzling rain. The roads were covered with a fine powder or film of dust, resulting from the use of the road by the defendants' trucks in connection with the performance of their contract. There were no signs or warning devices on Route 54 to indicate the existence of the intersection or its nature; nor was there any guard rail or warning device of any kind on Route 23 opposite the end of Route 54.

As the plaintiff proceeded along Route 54 he was traveling 30 to 35 miles an hour until his attention was drawn to the slickness of the pavement caused by the dirt and the rain. Upon noticing this, he slowed down to 20 to 25 miles an hour. As he neared the intersection, his lights were shining on the flat, black surface of the road at the foot of the hill, and were "just dying where they hit". As said, he was unfamiliar with the roads in that area and did not know of the existence of the intersection. When he discovered it and the fact that Route 54 did not extend beyond Route 23, and realized he would have to make a right angle turn, he was about 20 feet away. He immediately put on his brakes, his car began to skid, went out of control to the extent that he could not stop it. He tried to turn it into Route 23 but the momentum carried it over the embankment at the "dead-end" and against the pole. The resulting injuries were grievous.

The plaintiff being unfamiliar with the roads in that section, was traveling by a sense of direction. He knew that in going east on Route 54 he was proceeding in the general direction of his dormitory and while it is not clear, it is fairly inferable that he would have continued on Route 54 had it extended eastward beyond the intersection. In other words, the right angle turn was made necessary and was attempted by the plaintiff only because Route 54 came to an abrupt end, or at least it could have been so found by the jury.

Photographs in the record show the termination of Route 54 against a wooded background. This, considered with the other factors presented may well have been found by a jury to have had a tendency to render the topography obscure.

The case has been elaborately briefed and ably argued. We appreciate the efforts of counsel to assist us in the solution of the interesting questions presented, but it would be a work of supererogation to undertake a discussion in detail of all of the contentions made and the authorities cited. Since the case must be retried, we deem it proper to be content in the main with a statement of our conclusions and a reference to what we conceive to be the controlling principles of law.

■ The several contentions of the defendants are disposed of in a different order from that in which they are set out above. As to the third, a mere statement of the rule is a sufficient answer. If the injury result not from negligence but from the fact that the work is performed at all, or from the failure to perform it, then the contractor is entitled to share the immunity of the public body by whom he is engaged; but not so, if the injury results from the negligent manner in which the work is done. 43 Am. Jur. 825, 826; Note, 69 A. L. R. 496. With reference to highway contractors in particular, the rule is stated in an authoritative text as follows: "An independent highway contractor is denied the immunity from liability for damages resulting from highway defects and obstructions, which is sometimes granted the sovereign or public body, and, having a primary and nondelegable duty to keep the highway in safe condition during work thereon, a highway contractor must respond in damages for injuries due to his negligence or other breach of duty. Liability is predicated on breach of duty to the public and sounds in tort and not in contract." 40 C. J. S., Highways, Sec. 252.

The fourth contention requires a construction of the contract. It was designated as a "cost-plus-a-fixed fee

construction contract". In general and for present purposes this may be said to mean that the government was to reimburse the defendants for all costs and expenses incurred by them and pay them a fixed fee of $279,145.00 as compensation for their services including profit and overhead expense.

So far as pertinent, the obligation of the contractor was in the shortest possible time, "to do all things necessary for the completion of the following work: The construction of a plant for the loading of fixed rounds, shells etc . . . said plant shall include loading buildings, administration buildings, shops, railroads, *roads*, steam lines, air lines, electric lines, telephone lines, fencing, lighting, power house, dormitories, water and sewer systems, staff dwellings, mess hall, cafeterias, guard quarters, fire fighting and housing thereof, and other buildings necessary and appropriate for a loading plant of the approximate capacity aforesaid" etc. (Emphasis ours.)

The contract on its face was described as "Collateral contract to Contract No. W-Ord.-494, dated December 27, 1940, between the United States of America and Proctor and Gamble Defense Corporation". It concluded with this provision: "Subject to the provisions of Article 1 of this contract, all work and services hereunder shall be subject to the supervision, direction and control of the Contractor designated in Contract No. W-Ord-494, between the United States of America and The Proctor and Gamble Defense Corporation."

It inferentially appears that the last mentioned concern was to and did take over the plant upon its completion and operate it for the government. As said, it maintained a skeleton organization on the site throughout the time the construction was under way.

In Article 1 following the "Statement of Work", which the contractor agreed to do, the gist of which is set out above, it was provided that "said plant shall conform, insofar as practicable with the designs, drawings, specifications, details and standards which are on file in the offices of the Quartermaster General or Chief of Ordnance and which shall be furnished to the contractor."

No agency of the government made or furnished to the defendants any plans or specifications for the highways, or directed their location. Upon the contrary, according to the evidence so far, the highway system was wholly the design of the defendants' engineers, apparently what they conceived to be necessary for a complete plant of the kind they agreed to build. This included the location of the numerous roads and the plans and specifications therefor. A map introduced in evidence prepared by the defendants' engineering staff, and showing the plans so formulated by them, calls for a "dead-end" intersection at the junction of Route 54 and Route 23 just as it was at the time the accident occurred.

It is true that the plans for the roads as evidenced by the map were approved by some representatives of the Army, and it is also true that the map does not show, nor did the plans specifically call for, any highway markers of any kind, whether warning signs, direction indicators or what not. Hence, the defendants' contention is necessarily reduced to this: that because some representative of the United States Army approved the plan they formulated including the dangerous intersection in question, without specifically designating that a warning device or barricade be placed at that point, they were relieved of all responsibility, even though a dangerous condition resulted from the failure to erect such devices.

There seems to be several answers to this contention. The first is that to adopt this construction would be to hold, without justification, that a modification of the original contract in a vital particular resulted from the approval of defendants' plan without the road signs. This is true because the obligation to build a complete plant could not be discharged without the construction of the necessary roads. The only reasonable construction is that the parties intended a system of roads complete in the sense that they would be usable and safe for use as an integral part of the finished plant; otherwise the plant would not be complete.

Considering the circumstances and the intrinsic nature of the undertaking, it would be most extraordinary if, from the wide variety and multiplicity of things to be constructed, the government had singled out the relatively minor, though essential, job of marking the roads to make them safe for use, as a proper subject for a separate contract with another contractor. We judicially know as the all-inclusive nature of the contract before us indicates that there was no time for piece-meal business of that kind and so far as appears from the evidence there was no call for it whatever.

The situation was basically different from the ordinary construction of a highway for public use where the builder contracts with the state department of highways. It is common knowledge that in such a case the department itself maintains a force for the marking of highways. Here there is nothing to warrant the view that the government or any of its agencies was prepared to or intended to put up any signs or barricades at any point within the area; or that it intended to make a separate and distinct contract for that work.

Moreover, it was certainly intended that the highways be used by defendants' employees and those having business with defendants before the plant was completed. It is fairly inferable that such use was essential to the defendants' performance of their contract in other respects. Hence to say that by the failure of the representatives of the Army (whoever they were and assuming they had the requisite authority) to designate that appropriate signs and barricades be placed where reasonably necessary, relieved the defendants of all liability for not providing them, is to say that those representatives intended and authorized construction of highways that were dangerous for use, or more specifically that they approved a plan for a highway knowing that it was to be used and that the use of it would be dangerous; and this at a time when it is common knowledge that safety was vital to the pressing need for speed in getting the work done.

The question implicit in this view seems to answer itself.

 If it does not, then we think the following contract provision does: ''The work shall be executed in the best and most workmanlike manner by qualified, careful and efficient workers and in strict conformity with the best standard practices''. If we are correct in assuming that in order to perform their obligation to build a complete plant the defendants necessarily had to build a system of highways complete and ready for use, then under the evidence in this case that obligation had not been fully performed at the time of the accident because it was made to appear that the standard practice was to put an appropriately placed barricade and guard rails at an intersection such as that made by the junction of Routes 54 and 23.

██ ██n this connection there is very respectable authority to the effect that a contractor who, in the performance of his contract with a public body, makes a highway dangerous or leaves it in a dangerous condition and fails to properly guard it, knowing it is open to traffic, is liable for an injury sustained on that account by one rightfully on the thoroughfare. Kehm v. Dilts, 222 Iowa 826, 270 N .W. 388, and cases cited.

The case of Finchem v. Oman, 18 Tenn. App. 40, 72 S. W. (2d) 564, 567, opinion by Presiding Judge Faw, is pertinent to the question with which we are dealing. The Court there had under consideration an accident which occurred on a highway being improved by an independent contractor engaged by the State Department of Highways and Public Works. Answering the contention pertinent to the present case, the Court said: ''It is true, as argued for defendant, that the state department of highways, through its officers and representatives, and not the defendant, determined the location and height of the fill, and that there is no evidence that defendant constructed it in a negligent manner, or otherwise than according to the plans and specifications prescribed by the highway department; *but this did not relieve defendant of the duty to adopt reasonable safeguards to protect the traveling public from injury which might be reasonably apprehended from the presence of the obstruction thus created in the highway.* The undisputed proof shows that no effort was made to prevent the free use of the highway by the traveling public during the progress of the work in question, and that such use, both by day and by night, was continued without interruption.'' (Emphasis ours.)

What has been said is really a sufficient answer to the several cases cited by the defendant, all of which are

distinguishable from the present case. We may, however, in deference to the ability and zeal displayed by counsel for the defendant, refer to one which seems to be particularly stressed. This is the case of Chattanooga & T. River Power Co. v. Lawson, 139 Tenn. 354, 201 S. W. 165. That case is distinguishable in a number of respects. The first is that the damage complained of arose from the operation of the public work, a dam, after it had been completed, and not from the construction of it. The second is that the damage occurred after the work had been fully completed, accepted by the government and put into operation by it. To say that by analogy that is true in the present case would be to presuppose that an affirmative answer should be given to one of the controverted and determinative issues in the case, namely, that at the time of the accident the work had been accepted as completed and the responsibility of the defendants thus terminated. The third is that there the contractor appeared to have "performed the work strictly in accord with the specifications furnished it by its employer." Here, as already pointed out, the government in fact furnished no specifications for the building of highways, but only approved those furnished by the defendants. If it be said, as it relates to the question in hand, that this is in effect the same thing as if the government had furnished the plans (which we do not hold), then, we repeat, it must be regarded that the approval accorded those plans was subject to the general provision of the contract that the work should be done according to standard practices. In this view and under the evidence in this case it cannot be said, as was true in the case cited, that the defendants performed the work strictly in accordance with the specifications of the contract.

One other case particularly relied upon is Ryan v. Feeney & Sheehan Building Co., 239 N. Y. 43, 145 N. E. 321, 322, 41 A. L. R. 1. One thing among others that distinguishes that case from the present one is the fact that there the defect in the plans furnished by *the* government and followed exactly by the contractor was not of such a nature as to ''bring home to the contractor that it was doing something which was likely to cause injury''. Just the opposite is true here. The defendants' engineer testified that the intersection was dangerous without a guard rail or barricade, a fact that must have been obvious to any prudent road contractor.

There are other equally good reasons why that case is not in point but the one given must suffice. Nor would it serve any useful purpose to discuss the other cases cited by defendants in this connection. They are all, we think, distinguishable for one or more of the reasons that we have given with respect to those just discussed.

■ The fifth contention, also vigorously pressed, is based upon the general rule governing the liability of a highway contractor, which has been stated as follows: ''After completion of the work and its acceptance by the governmental body, the contractor's liability ceases, and he may not be held responsible for damages thereafter accruing, since, on termination of his control of the road the contractor owes no further duty to the traveling public''. 40 C. J. S., Highways, Sec. 252.

■ We think it true that within the meaning of this rule acceptance sufficient to evidence termination of control may be factual and as such effective even though there has been no full, formal acceptance. Ibid. But it should be said that this does not mean that a contractor

can rid himself of responsibility by assuming the authority himself to open the road to traffic, coupled with an ex parte declaration that his work is done.

While it is of course not so stated, the defendants' argument that their work had been completed seems impliedly to postulate that the defendants were highway contractors, employed to build a system of roads. This was obviously not the case. As already said, the building of the roads, while a sizeable undertaking in itself, was a mere incident to the larger obligation to construct a complete shell loading plant. Hence we think it might well be argued that so far nothing has been developed in the case to warrant the conclusion that the defendants' work was or was to be accepted by piecemeal,—a road here, a building there, and the like. Upon the contrary, although it was not fully shown, it inferentially appears that while the defendants were still engaged in the work as they were at the time of the accident under consideration, the use of the roads constructed by them was primarily by their own employees and those having business with them. So far as appears, no part of the plant was in operation at that time, or ready for operation, and it is a fair inference that the only ones having business in the area had to do with the performance of the defendants' contract.

Now, it is needless to say that in no event could the defendants show an acceptance terminating their responsibility by proving only that the roads were used by their own employees in the performance of their contract, or by others having business essentially connected therewith.

But wholly apart from the foregoing, the determinative question on this phase of the case was, to say the

least of it, one about which reasonable minds could differ.

The evidence relied upon by the defendants to show a termination of their responsibility is found in the testimony of their own road engineer who was in charge of the roads in the project area and who was examined as a witness by the plaintiff. Asked with respect to the policy controling the use of a road as it was being completed, the witness replied: ''We would get in and complete a road and as soon thereafter as possible or practical, the traffic took it and used it . . . There wasn't ever any formal acceptance that I know anything about, that would authorize a person to use a road, that is, to the extent of saying when he could use it. In other words, when we completed a road it was there and they started to use it . . . Everybody in the area would use it that had occasion to use it'', including the guards. And again, ''I would say that anybody that had occasion— that is, that had a badge or was under the supervision of the Army or the Ferguson-Oman Company, used the road''.

The evidence does not appear to disclose the number of Army personnel located on the area or the number of employees in the skelton organization maintained in the area by the Proctor & Gamble Defense Corporation. But considering the state of the work at the time of the accident and the other facts and circumstances, it was a fair inference that the bulk of the people in the area were the employees of the defendant and their sub-contractors, and that the larger portion of the use of the roads was by them and in connection with the performance of the defendants' obligations.

The evidence tending to show a state of facts negativing a termination of the defendants' responsibility was

as follows: (1) the plaintiff's witness, Curtiss McGowan, testified that he knew it to be a fact that at the time of the accident the defendants were maintaining the roads in the area; that they had their own police department, their own safety department, their own fire department, and neither the government or any other private concern had any organization in the area equipped to do road maintenance work. (2) The defendants' engineer in testifying for the plaintiff qualified his testimony with respect to the completion of the road by saying that it had been completed "insofar as the plans and specifications pertained to the grading, the drainage and the paving". (3) The defendants' senior draftsman who was examined as a witness by the plaintiff testified that in July, 1941, when he arrived on the scene and went to work there was in the defendants' files a design of a striped barricade which he revised by putting reflectors on the top of it, and that after the accident this barricade was put up by the defendants at the scene opposite the "dead-end" of Route 54. It was also shown that after the accident signs were put up on the roads by the defendants throughout the area.

The fact that the barricade and other signs were erected after the accident was competent not as an admission of negligence but as tending to show that the road was still under the control of the defendants. Jones on Evidence, Vol. 3, Sec. 1042; Wigmore on Evidence, Vol. 2, Sec. 283, p. 158. In the last mentioned text it is said: "When the defendants' liability depends upon . . . whether a municipal corporation was exercising authority over a highway, the acts of control of such a person are provable and an act of repair done after the injury may chance to be such an act".

(4) As evidencing control within the meaning of this rule, the defendants' engineer testified that "if there was any flaws in the road, whereby traffic was impeded or the work as a whole flowed, the Ferguson Oman Company made those repairs", prior to the time that "Proctor & Gamble organized their maintenance crews". Other evidence was to the effect that Proctor & Gemble did not take over the burden of maintaining the road until the completion of the plant in the spring of 1942.

Without further details we are satisfied that under the foregoing evidence it was for the jury to determine, under proper instructions from the court, whether at the time of the accident the roads at the scene were still under the charge of the defendants.

The evidence we think was sufficient to call for the application of another rule. This is that "One may render himself liable for the safety of a highway by the voluntary construction of improvements or the assumption of some duty with respect to the maintenance or repair of the way". 25 Am. Jur. 656, Sec. 363; 38 Am. Jur. 660, Sec. 18.

Apart from whether they were obligated to do so, the evidence was sufficient, we think to have the jury say whether, for their own purposes or otherwise, the defendants had assumed the burden of maintaining the highway in a usable condition.

This brings us to the contentions that there was no evidence of negligence on the part of the defendants and that by the undisputed evidence the plaintiff was shown to have been guilty of proximate contributory negligence.

As already said, since the case must be re-tried, we deem it inappropriate to embark upon an argumentative

discussion of the evidence in order to demonstrate our views with respect to these two contentions.

With respect to one's responsibility for the safety of a road, the measure of his duty is the familiar rule of ordinary care. If, at the time of the accident, the responsibility of the defendants had not terminated, then we think it a question for the jury as to whether they were negligent in failing to erect appropriate guard rails and warning signs at or near the intersection.

We reach the same conclusion with respect to the contention that the plaintiff was guilty of proximate contributory negligence as a matter of law. This insistence is based primarily upon the rule of West Construction Co. v. White, 130 Tenn. 520, 172 S. W. 301, to the effect that it is contributory negligence precluding recovery for the driver of an automobile to propel it in a dark place in which he has to rely on the lights of his machine at a rate faster than he is able to stop or avoid any obstruction within the radius of his lights or within the distance within which his lights would disclose the existence of the obstruction. It has been pointed out a number of times that the rigor of this rule has been relaxed to the extent that exceptional circumstances may make its applicability a question of fact for the jury rather than one of law for the court. Main Street Transfer & Storage Co. v. Smith, 166 Tenn. 482, 63 S. W. (2d) 665.

In several cases where there was evidence of conditions and circumstances from which it could be reasonably inferred that the driver of a motor vehicle might not see the obstruction, although it was in front of his car and within the distance to which the range of his lights would ordinarily reach, this court has held that the

plaintiff could not be said to be guilty of contributory negligence as a matter of law which would bar his recovery under the rule of West Construction Co . v. White, supra; Finchem v. Oman, supra; Patterson v. Kirkpatrick, 11 Tenn. App. 162; Huntsman Bros., Inc., v. Grocers Baking Co., 12 Tenn. App. 535; Westmoreland Heights v. Martin, 13 Tenn. App. 142.

In Inter-City Trucking Co. v. Greeson, Shelby Law, decided by this Court May 18, 1934, it appeared that while driving in the darkness at about 30 miles an hour, plaintiff ran into an unlighted truck standing on the highway extending diagonally across the pavement with the left rear wheel two feet over the center stripe. The defendant invoked the rule of West Construction Co. case. We held it not applicable, and that the question of the plaintiff's contributory negligence was one for the jury, due to the following state of facts: "The truck was old, muddy and dingy, and was unlighted; the tarpaulin cover coming well down over the sides, was a dark gray or slate color, so that the outline of the truck so blended with the concrete highway that Mrs. Greeson could not see it until she was right upon it. The body of the trailer was 3½ feet above the surface of the road; her lights were reflected downward so as to shine on the road, as is usual. Her brakes were in excellent condition, and she applied them when she first saw the danger."

 The rule invoked by defendants contemplates an "obstruction" on a highway and this means something that would be readily disclosed by the rays of light to one exercising ordinary care. The defect here was not an obstruction, as that term is ordinarily used, but an abrupt and unsignaled ending of the highway. The pictures in the record show it against a wooded background.

These facts, together with the further fact that due to the rain and fine film of dust on it the road was slippery; we think, take the case from under the rule of West Construction Co. v. White. In brief, we think it is a question for the jury to say whether the rate of speed at which the plaintiff was driving was negligence considering in this connection whether the ending of the road was such a defect as that he could have discovered it within time to have stopped his car and avoided the accident.

 Finally it is insisted that at most the defendants were guilty of nonfeasance only; that since, as to third persons they were liable only for misfeasance, the verdict was properly directed. The rule presupposes the existence of the relationship of principal and agent. It has been repudiated by the American Law Institute and in practical effect abandoned in this state. Scott v. Burton, 173 Tenn. 147, 114 S. W. (2d) 956. But if it were otherwise, it could have no application here, for we think it beyond debate that so far as is concerned any question in this case the defendants are not to be regarded as agents or servants of the government but as independant contractors. Cf. McDonald v. Dunn Construction Co., 182 Tenn. 213, 185 S. W. (2d) 517.

 The defendants complain that their engineer testifying for the plaintiff was allowed to say over their objection that the intersection without guard rails was dangerous. Not having laid the proper groundwork or brought that question herein a proper manner, the defendants are in no position to have that evidence ruled out in this Court. But in disposing of the case we have not found it necessary to consider it and since the case must be retried, it is proper to say that we think it was incompetent and should not be again allowed. It was an

expression of an expert opinion upon an ultimate fact to be decided by the jury, and one which that body was qualified to determine for themselves upon proof of the physical facts and circumstances. National Life & Accident Ins. Co. v. Follett, 168 Tenn. 647, 654, 655, 80 S. W. (2d) 92, and cases cited.

The result is that the judgment is reversed and the case remanded for a new trial. The defendants will pay the cost of the cause, including the cost of the appeal.

Baptist and Hamner, JJ., concur.